## CIRCUIT COURT OF THE CITY OF RICHMOND

Stanley Oginz

    v.

Craftsman Electrical
Manufacturing, Inc., et al.

January 15, 1998

Case No. HH-1039-3

BY JUDGE T. J. MARKOW

This case is before the Court on plaintiff Stanley Oginz's Motion for Declaratory Judgment against the defendants, Craftsman Electrical Manufacturing, Inc., Brake Supply Company, Crestar Bank, Frederick J. Oginz, Eric W. Anderson, and Garnett O. Lee. Brake Supply was dismissed from this action. On December 17, 1997, the Court heard evidence *ore tenus* and requested that counsel submit final arguments via letter memoranda summarizing their clients' respective positions.

## I. *Summary of Facts, Claims, and Relief Sought*

Craftsman Electrical Manufacturing, Inc., was incorporated on September 7, 1995, to engage in the business of manufacturing electrical starters and alternators. Fred Oginz, Eric Anderson, and Garnett Lee were stockholders of Craftsman and served as secretary, treasurer, and president, respectively. Robert Parada, a non-party witness at trial, served as Brake Supply's shop foreman and later worked for Craftsman as a manager. On September 19, 1995, Craftsman signed a five-year lease with Brake Supply Company in Richmond, Virginia. Craftsman and Brake Supply each agreed to pay a *pro rata* share of the gas, electric, and water/sewage service costs. On September 21, 1995, a Stock Restriction Agreement authorized the issuance of 1,000 shares of stock: 240 shares to Lee; 40 shares to Parada; 240 shares to Anderson; 240 shares to Fred Oginz; and 240 shares to Mary Anderson (Eric Anderson's mother). All shareholders had voting privileges except Mrs. Anderson.

Craftsman executed a note and security agreement payable to Crestar in the amount of $56,000 on September 20, 1995, pledging the following collateral:

> [a]ll account, inventory, furniture and equipment, general intangibles, instruments, documents, and chattel paper now existing or hereafter acquired and all proceeds and products thereof as more particularly described in a security agreement by Craftsman dated September 20, 1995, and an assignment of certificate of deposit [("CD")] . . . issued by Crestar Bank to Eric W. Anderson in the amount of $45,000 . . . .

Crestar's default claim for $13,849.03 plus interest against Craftsman and its shareholders/officers is being litigated in a separate suit.

On September 20, 1995, Anderson assigned a $45,000 CD to Crestar in order to secure Craftsman's $56,000 bank debt. Fred Oginz, Anderson, and Lee executed a guaranty agreement on September 21, 1995, to secure Craftsman's debt to Crestar in an amount not to exceed $60,000. The third paragraph of the Unconditional Guaranty states that "the Guarantors, jointly and severally, absolutely and unconditionally, guarantee to the Bank payment when due, whether by acceleration or otherwise, of any and all Liabilities of the Debtor [Craftsman] to the Bank [Crestar] . . . ."

On September 26, 1995, Craftsman executed a note and security agreement for $150,000 payable to Stanley Oginz for the purchase of busi-

ness and manufacturing equipment. Despite the payee's insistence that a list of collateral was attached to the note when it was executed and delivered, the other parties disagree as to whether the list was present as well as whether the words "accounts receivable and inventory" were subsequently added at the bottom of the third page.

On September 26, 1995, a financing statement on the Oginz loan was filed with the Richmond Circuit Court at *11:29 a.m.*, showing Craftsman as the debtor and Stanley Oginz as the secured party. The security was contained in a three page, sixty-one item list of equipment plus "all accounts receivable and inventory up to $103,000." A financing statement on the Anderson CD was filed with the Richmond Circuit Court at *11:30 a.m.* on September 26, 1995, showing Craftsman as the debtor and Anderson as the secured party. The security was specified as "all accounts, receivables and inventory, not to exceed the outstanding balance of the credit line account between Anderson and Crestar Bank."

On October 4, 1995, a financing statement on the Crestar loan was filed with the State Corporation Commission, showing Craftsman as the debtor and Crestar as the secured party in:

> [a]ll of the Debtors rights, title and interest now existing or here-
> after acquired in all accounts, inventory, furniture and equipment,
> general intangibles, insurance proceeds, instruments, documents
> and chattel paper and all proceeds and products.

On October 10, 1995, a financing statement on the Oginz loan was filed with the State Corporation Commission at *9:38 a.m.*, showing Craftsman as the debtor and Stanley Oginz as the secured party in "[a]ll accounts, receivables and inventory, not to exceed the outstanding balance of the credit line account between Anderson and Crestar Bank." At the exact same time and date, a financing statement on the Anderson CD was filed with the State Corporation Commission, showing Craftsman as debtor and Anderson as the secured party in a three page, sixty-one item list of equipment plus "all accounts receivable and inventory up to $103,000."

On October 17, 1995, a financing statement on the Crestar loan was filed with the Richmond Circuit Court, showing Craftsman as the debtor and Crestar as the secured party.

Craftsman ceased to operate its business on or about January 1, 1996. At that time, its sole assets consisted of the equipment, inventory, and accounts receivable upon which Stanley Oginz, Crestar and Anderson claim to possess liens. According to testimony at trial, all equipment, inventory

and receivables was sold to a third party at the instruction of Fred Oginz and Anderson. The sale proceeds were given to Anderson to be placed "in trust," although he actually retained approximately $12,000 as a "creditor" of the business and applied the balance of approximately $1,500 to the Crestar loan.

In his Motion for Declaratory Judgment and final memorandum, Stanley Oginz asks this Court (1) to declare that he has a first lien on all of the assets and proceeds of Craftsman, including the equipment, inventory, and accounts receivable; and (2) to grant judgment in his favor against Anderson for all sums derived from the sale of Craftsman's assets during the pendency of this suit. In the event that the Court finds that Stanley Oginz does not have a first lien on the Craftsman assets, he asks the Court to allow his third party cross-bill for legal malpractice against John Goots to proceed. This action was severed on December 5, 1997, pending the outcome of the underlying declaratory judgment action.

Anderson filed numerous cross-bills in this action. First, he filed a cross-bill against Lee and Fred Oginz seeking indemnity and contribution for both the liability and any payments made to Crestar to settle the Craftsman debts in excess of Anderson's present and future *pro rata* share. Oginz responded that Anderson pledged the CD to Crestar in order to secure the Craftsman note in its entirety, rather than to secure himself as guarantor of the note; Anderson's CD is liable without regard to contribution from Lee or Oginz; and Crestar's unliquidated debt does not give rise to a *pro rata* indemnity contribution. Second, Anderson filed a cross-bill against Lee and Brake Supply alleging unjust enrichment in the amount of $18,000, the approximate value of an outdoor storage shed constructed on the leased premises at the urging of Brake Supply and/or Lee. Lee responded that the building of the storage shed was part consideration, along with the pledging of Anderson's CD, for the issuance of 240 shares of Craftsman stock to Anderson. Lee also contended that the pledged collateral would be used to satisfy the debt owed to Crestar in the event of default without any expectation of contribution or indemnification from either Lee or Fred Oginz with respect to the CD or any other payments made by Anderson on behalf of Craftsman.

In addition, Anderson's cross-bill against Lee and Brake Supply seeks indemnity or contribution for excessive utility payments and salary paid to Bob Parada. Lee responded that Anderson has not paid (on behalf of Craftsman) the total utility bills as provided in the lease, and there was no oral or written agreement between Craftsman and Brake to split Parada's salary.

Third, Anderson filed a cross-bill against Stanley Oginz seeking a declaration that Anderson possesses a first lien on Craftsman's accounts receivable and inventory, Stanley Oginz is an unsecured creditor, and that Crestar possesses a first lien on the equipment and a second lien on the accounts receivable and inventory of Craftsman. In the alternative, Anderson seeks to have himself and Stanley Oginz declared as unsecured creditors and Crestar as the only secured creditor of Craftsman.

Fourth, Anderson filed a third party cross-bill against John H. Goots, Esq., for legal malpractice.

Fifth, Anderson filed a cross-bill against Fred Oginz seeking a declaration that Anderson possesses a first lien on Craftsman's accounts receivable and inventory and damages for detrimental reliance upon Oginz's representations regarding the contribution of $50,000 in additional capital to Craftsman.

In his memorandum, Fred Oginz contends that Anderson's CD should be applied as a corporate asset to reduce each parties' debt, such that no contribution would be warranted unless the Court finds that one party paid more than his share to Crestar Bank in order to settle its claim against Craftsman. Further, Oginz argues that Anderson's claim for contribution should be barred by the doctrine of "unclean hands," as he improperly retained the proceeds from the sale of Craftsman's assets.

Anderson's memorandum asks the Court (1) to rule that he has a first lien on Craftsman's inventory and receivables up to the amount of $56,000; and (2) to grant judgment for his cross-claims against Fred Oginz and Lee in an amount representing their *pro rata* shares of the joint debt to Crestar paid on their behalf by Anderson through the set off of Anderson's $45,000 CD.

In his memorandum, Lee requests that the Court find that (1) Anderson is not entitled to contribution or indemnity from Lee because he agreed to be solely responsible for $45,000 of the $56,000 debt owed to Crestar; (2) Anderson has failed to establish any amount of unjust enrichment garnered by Lee through Anderson's construction of the storage shed; (3) Lee is not personally liable to pay the utility costs as provided for in the lease between Craftsman and Brake Supply; and (4) Lee cannot be held individually liable for half of Bob Parada's salary as he is not personally responsible for the debts of the corporation. Should the Court decide to grant contribution or indemnity, Lee requests that any amount awarded to Anderson should be offset by the amount retained by Anderson after the sale of Craftsman's inventory, $12,000.

## II. *Discussion*

### A. *Stanley Oginz's Claims*

#### 1. *Lien Priority*

Generally, two documents are required to create a perfected security interest in a debtor's collateral. First, a security agreement must give a creditor an interest in the collateral . . . . The second document required . . . is a financing statement, a writing filed for public record . . . . The requisites of a financing statement are set forth in Code § 8.9-402(1).

*Whitmore & Arnold, Inc. v. Lucquet*, 233 Va. 106, 109, 353 S.E.2d 764, 766 (1987). A financing statement must be filed in the office of the State Corporate Commission and in the office of the clerk of court in which the debtor has a place of business in the Commonwealth. Va. Code § 8.9-401(1)(c).

The essential elements of a security agreement are (1) a writing manifesting an intent to create or provide for a security interest, (2) signed by the debtor, and (3) containing a description of the collateral. 68A Am. Jur. 2d, *Secured Transactions*, § 166 (1993). Virginia Code § 8.9-203(1)(a) requires that a security agreement be embodied in a writing that contains the debtor's signature and a description of the collateral. Any description of the property secured is sufficient, whether or not it is specific, if it reasonably identifies what is described. *Id*. § 192. The $150,000 promissory note received by Stanley Oginz was also referred to as a "Security Instrument" by its terms. It was signed by Lee in his capacity as president of Craftsman. A three page, sixty-one item listing of the equipment sold by Oginz to Craftsman was attached to the note. The Court finds that this list was included as both an inventory of the sale items as well as a statement of collateral. *See, e.g., Whitmore & Arnold*, 233 Va. at 110, 353 S.E.2d at 767, n. 4 (composite document theory of security agreements). As such, Oginz held a security interest in Craftsman's accounts receivable, inventory, furniture, and equipment, etc. as of September 26, 1995. Crestar's security interest in the same items was executed on September 20, 1995. No evidence was presented to establish that Anderson executed a security agreement regarding his CD with Craftsman. Priority of claimants to the liens is dependent upon the time of perfection or filing, whichever is first.

A financing statement on the Oginz loan was filed with the Richmond Circuit Court at 11:29 a.m. on September 26, 1995. One minute later, a financing statement on the Anderson CD was filed with the Court. A financing statement, in its usual statutory form and disclosing no terms of a security agreement, does not additionally serve as a security agreement. *In re Mann*, 318 F. Supp. 32, 34 (W.D. Va. 1970). Anderson did not have a security agreement with Craftsman; he merely filed a financing statement. As such, Anderson's security interest could not be perfected and is unenforceable. A financing statement on the Crestar loan was not filed with the Court until October 17, 1995. The State Corporation Commission filings were not done until October 4, 1995, (Crestar) and October 10 (Oginz and Anderson). The dual filing requirements of § 8.9-401(1)(c) are mandatory. *See In re Hunt Enters., Inc.*, 321 F. Supp. 1307 (W.D. Va. 1971).

The Oginz loan financing statement was filed with the Richmond Circuit Court prior to the Anderson CD financing statement. "*Priority [among conflicting security interests] dates from the time a filing is first made* covering the collateral or the *time the security interest is first perfected*, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection." Va. Code § 8.9-312(5)(a) (emphasis added). As stated above, Anderson's security interest is invalid. The first filing *and* perfection — as between the conflicting claimants, Oginz, Anderson, and Crestar — was accomplished by Oginz. Oginz is entitled to a first priority as to the equipment, inventory, and accounts receivable of Craftsman up to $103,000. As such, the Court will not permit Stanley Oginz's third party cross-bill for legal malpractice against John Goots to proceed.

### 2. *Proceeds from Sale of Craftsman's Assets*

In a letter dated March 24, 1997, (Plaintiff's Exhibit # 7), counsel for Stanley Oginz asked that the $15,000 sale proceeds be placed in escrow pending the Court's decision as to how they should be applied. This request was made to counsel for Anderson and all other parties to this suit. At that time, the parties were not obligated by any order of this Court to preserve Craftsman's assets or to distribute the sale proceeds in a certain way. However, in his answer to Stanley Oginz's Motion for a Temporary Restraining Order,[1] Anderson indicated his willingness to consent to a

---

[1] This case (HH 10039) was consolidated with the instant case (HH 10066) by Order dated October 15, 1996.

freeze on the sale of assets and placement of the proceeds of any sale, accounts receivable, and other cash in an escrow account, subject to the consents of Stanley Oginz and Crestar. Parada testified that he sold Craftsman's equipment and inventory to a third party on the orders of Fred Oginz and Anderson for a small fraction of book value. Anderson testified that he never agreed to the sale and that it was done solely on Fred Oginz's orders. The proceeds were deposited into the corporate account and distributed to Craftsman's creditors, approximately $12,000 to Anderson and $1,500 to Crestar.

"Absent clear and convincing proof that a debtor made the preference with the intent to defraud the other creditors and that the preferred creditor had notice thereof, the unpaid creditors cannot successfully attack the preference as a fraudulent conveyance." *Mills v. Miller Harness Co.*, 229 Va. 155, 157, 326 S.E.2d 665, 666 (1985). Clear and convincing evidence of Anderson's intent to defraud was not presented at trial. Anderson and Fred Oginz merely ordered Parada to liquidate Craftsman's assets once it became clear that the business would never resume operating. Although Parada testified that the actual sale proceeds were *de minimis* as compared to book value, the Court has no basis for labeling this transaction a fraudulent conveyance. Inadequate consideration by itself is insufficient to set the conveyance aside as fraudulent. 9A M.J., *Fraudulent and Voluntary Conveyances*, § 19 (citing *Tebbs v. Lee*, 76 Va. 744, 751 (1882)). Further, although Anderson violated his own "no sale" pledge and in fact benefited from the proceeds, it is illogical to assume that he elicited fraudulent intent in encouraging a distress sale that netted far less than the market value of the assets. In other words, if Anderson was fraudulently attempting to trump his fellow shareholders and claimants on the Craftsman assets, he would not have agreed to sell the assets for such a relatively small amount, an amount equal to a little more that 10% of his alleged total investment in Craftsman of $100,000. Nonetheless, Anderson did *not* have a first priority on the equipment, inventory, and accounts receivable of Craftsman. The Court will award judgment in favor of Stanley Oginz against Eric Anderson in the amount of $12,000, the cash value of Craftsman's equipment and inventory as of the sale date.

B. *Anderson's Cross-claims*

1. *Lien Priority*

Stanley Oginz has first priority on all equipment, receivables, and inventory up to $103,000. Anderson is an unsecured creditor.

### 2. *Indemnity and Contribution*

Contribution equalizes co-sureties by obliging the parties who have paid nothing or less than their shares to indemnify the party who has paid more. *Rosenbaum v. Goodman*, 78 Va. 121 (1883); *Aetna Cas. & Sur. Co. v. Whaley*, 173 Va. 11, 3 S.E.2d 395 (1939). The right to contribution arises out of equity rather than stemming from any express contract or agreement. *Rosenbaum*, 78 Va. at 126. A court will not compel a surety to contribute to the relief of his cosurety who has been forced to pay the debt, unless it appears that due diligence was used, without effect, to obtain reimbursement from the principal obligor, or that he was insolvent. *McCormack v. Obannon*, 17 Va. (3 Munf.) 484 (1811). A surety is not entitled to a judgment against his cosurety until he has paid more than his part of the debt of the principal. *Young v. Bowen*, 131 Va. 401, 108 S.E. 866 (1921).

Indemnity is distinguishable from contribution in that contribution springs from the *equitable* theory that where there is a common burden there should be a common right, while indemnity springs from an express or implied *contract. Moretz v. General Electric Co.*, 170 F. Supp. 698, 704 (W.D. Va.), *aff'd in part and rev'd in part*, 270 F.2d 780 (4th Cir.), *rehearing denied*, 272 F.2d 624 (4th Cir. 1959), *cert. denied*, 361 U.S. 964 (1960). If indemnity is to be allowed in this case, it must be shown to spring from a contractual relationship between Anderson, Lee, and Fred Oginz.

### a. *Certificate of Deposit*

Anderson assigned a personal CD to Crestar in the amount of $45,000 to induce the bank to execute a $56,000 Commercial Note with Craftsman. The fine print grants the bank a right of set off upon default: "[t]he proceeds of any Collateral may be applied against the liabilities of the undersigned to the Bank in such order as the Bank deems proper." In addition, Fred Oginz, Anderson, and Lee signed an Unconditional Guaranty of joint and several liability on the Crestar note. Upon Craftsman's default on the Crestar note, the bank set off the $45,000 CD against the balance due. Construing these two documents together reveals the dilemma: should the CD be treated as corporate property and credited equally to each guarantor without regard to the fact that it was Anderson who pledged the CD; or should Anderson receive a 1/3 credit for his pledge of the $45,000 CD and allowed 2/3 contribution/indemnity from Lee and Fred Oginz, $15,000 each?

Anderson contends that he never transferred the CD to Craftsman, although he voluntarily pledged this instrument as collateral for the Crestar note. Lee contends that the CD pledge was consideration for the 480 Craftsman shares that Anderson and his mother received. Fred Oginz argues that the CD was consideration for Mrs. Anderson's shares and should be considered a corporate asset in reducing the indebtedness to Crestar. These assertions are at least partially contradicted by Parada's testimony that Anderson only agreed to contribute a maximum of $25,000 to "plant up-fit." Regardless, Anderson and his mother have clearly expended a grossly disproportionate amount of cash as compared to Lee and Oginz. As the three cosureties agreed to be jointly and severally liable on the Crestar note, Anderson should not be penalized for risking his CD in order to secure the loan. The CD has already been set off against Craftsman's debt to Crestar.

Contribution is ordered as an equitable remedy in order to require the three parties to share the common burden of Craftsman's debts. Indemnity is *not* appropriate here because the officers expressly agreed to be jointly and severally liable for any "existing" debts to Crestar. The only currently existing debt consists of the excess above the $45,000 already set off by the bank, approximately $13,800. Contribution shares for *that* excess amount will be determined in the pending Crestar action.

"[T]he determination of what constitutes a proportionate share in this [contribution] case should be determined by the amount [originally] owed to the Bank" rather than the amount paid in settlement. *Sacks v. Tavss*, 237 Va. 13, 18, 375 S.E.2d 719, 721 (1989). Further, "a surety is not entitled to a judgment against his co-surety until he has paid more than his part of the debt of the principal." *Id*. (citation omitted). Although Anderson has already lost his $45,000 CD to the Crestar Bank he has paid nothing towards the balance remaining of Craftman's debt. Anderson is only entitled to contribution on 2/3 of the $45,000 amount.

b. *Storage Shed*

Prior to the formation of Craftsman, Anderson, Fred Oginz, and Lee entered into a verbal agreement whereby Anderson would contribute up to $25,000 towards "plant up-fit" in exchange for his shares. Anderson testified that he actually expended $18,200 on the construction of a storage shed on the property leased from Brake Supply. Lee's contribution consisted of "making space" on his premises for Craftsman's operations and

sharing the services of his employee, Parada. Fred Oginz's contribution was characterized as "sweat equity."

Anderson's second Cross-bill alleges that Lee and Brake Supply were "unjustly enriched" through Anderson's construction of the storage shed on Brake Supply's property.

> It is settled that money paid to another under the influence of a mistake of fact, provided payment has not caused such a change of position by the payee that it would be unjust to require a refund, may be recovered . . . . To constitute a mistake of fact, the payment must have been made under a mistaken belief that the money was due the payee when in truth it was neither legally nor morally due.

*Bolden v. Duckett*, 6 Va. Cir. 494 (Richmond 1974) (Compton, J.). Here, Anderson made no "mistake" in allocating the funds to construct the shed; he was obligated under his oral agreement with Fred Oginz and Lee to contribute this capital for plant up-fit. Further, no testimony was produced to establish that the monies were paid directly to either Lee or Craftsman or that Lee is liable in his individual capacity on this Cross-bill. Finally, Anderson failed to offer any evidence of his alleged damages. The claimant has the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis for recovery. *Carr v. Citizens Bank and Trust Co.*, 228 Va. 644, 651, 325 S.E.2d 86, 89 (1985) (recovery of damages in an action on an injunction bond). Anderson offered neither written documentation nor testimony to establish his loss. While it is unfortunate that Anderson has lost this sunk cost, he was aware that the shed was constructed as an attachment to Brake Supply's building and cannot obtain recovery here.

#### c. *Utility Payments and Parada's Salary*

The lease agreement between Craftsman and Brake Supply specifies that the two corporate entities would pay a *pro rata* share of the gas, electric, and water/sewage service costs. In addition, Anderson states that there was an informal agreement between the two entities to share the cost of Parada's salary. Anderson contends that he personally paid these costs and is entitled to contribution and/or indemnity from Lee. Stock ownership does not make a corporate stockholder liable for the debts of that corporation. *Regal Ware, Inc. v. Fidelity Corp.*, 550 F.2d 934, 944 (4th Cir. 1977) (corporate veil not pierced). Further, no evidence was presented to show that Lee executed any written documents providing that he would be per-

sonally liable for Brake Supply's debts, whether utility costs or salaries. *See General Sheet Metal Works, Inc. v. First and Merchants National Bank*, 211 Va. 555, 556, 179 S.E.2d 644, 645 (1971) (Statute of Frauds mandates that a promise to pay the debt of another must be in writing). Finally, as discussed above in subsection (b), Anderson has failed to offer any proof of his damages, e.g., canceled checks, utility bills, etc. In sum, the Court finds no equitable or contractual basis for imposing contribution or indemnity upon Lee for Anderson's payments made to utility creditors and Parada.

### 3. *Detrimental Reliance*

Anderson contends that he detrimentally relied upon Fred Oginz's representations as to the viability of Craftsman in making an additional $50,000 investment in the business.

> Applicable Virginia precedent clearly establishes that a party seeking to invoke [this] doctrine . . . must prove by clear, precise, and unequivocal evidence the following elements: (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the facts; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to his injury.

*Boykins Narrow Fabrics Corp. v. Weldon Roofing and Sheet Metal, Inc.*, 221 Va. 81, 86, 266 S.E.2d 887, 890 (1980). Anderson presented insufficient evidence of the foregoing factors; this Cross-bill is hereby denied.

In conclusion, the Court declares that Stanley Oginz has a first lien on all the assets and proceeds of Craftsman, Eric Anderson is an unsecured creditor of Craftsman, and Stanley Oginz is entitled to judgment in the amount of $12,000 against Anderson. With regard to Anderson's Cross-bills, the Court grants judgment in the amount of $30,000 in favor of Anderson with regard to his claim for contribution against Fred Oginz and Garnett Lee. Anderson may not recover on his claims for contribution and/or indemnity of the utility and salary costs. Further, no showing of damages from detrimental reliance upon the representations of Fred Oginz was made by Anderson.