### Richmond

Natalie Carr, et al.

v.

Citizens Bank and Trust Company

Record No. 820355.

January 18, 1985.

Present: All the Justices.

*Charles H. Cuthbert, Jr.,* for appellants.
*Kennon C. Walden, Jr. (Walden & Walden, P.C.,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Citizens Bank and Trust Company (the Bank) instituted this action on an injunction bond against Natalie Carr, principal obligor on the bond, and Charles H. Cuthbert, Jr., surety thereon. The Bank alleged that Carr had moved the trial court to enjoin the foreclosure sale of certain real estate; that upon execution of the injunction bond in the penalty of $25,000 the trial court enjoined the sale; that the court dissolved the injunction one week later upon Carr's motion but required that $5,000 of the cash surety deposited with the bond be retained subject to further order of the court; that Carr was not entitled to the injunction; and that the Bank had been damaged by the injunction in the amount of the bond. In a jury trial, the jury returned a verdict in favor of the Bank against Carr and Cuthbert, jointly and severally, in the amount of $10,000; the trial court entered judgment on the verdict.

On appeal, Carr and Cuthbert challenge the sufficiency of the evidence of damages attributable solely to the injunction. They further contend that the trial court erred in instructing the jury, in admitting certain evidence presented by the Bank, and in failing to strike the testimony of an allegedly unqualified witness who testified for the Bank.

At trial, certain facts were stipulated. By deed dated September 25, 1975, Carr conveyed 12.28 acres of land on both sides of State Route 40 at the Town of McKenney to M & W Services, Incorporated (M & W), whose principal officer was Carl Mason. M & W executed a note dated October 1, 1975, payable to Carr's order, secured by a deed of trust of the same date. M & W, after having the tract subdivided into platted lots, obtained from the Bank a construction loan in the amount of $37,500, evidenced by M & W's note secured by a deed of trust on 24 lots. Carr authorized the release of her note and the deed of trust securing it upon M & W's execution of another note in the amount of the balance then payable to her, secured by a second deed of trust which was made expressly subordinate to the Bank's lien.

Mason, who became bankrupt in 1978, died in 1979. When M & W defaulted on its note payable to the Bank, the Bank notified the trustee in the deed of trust to advertise the property for sale at public auction. The trustee advertised the foreclosure sale for May 17, 1980.

On May 15, 1980, Carr filed suit in the trial court against the Bank, M & W, and others alleging that an attorney, Mason, M & W, and the Bank had "participated" in a fraud upon her. She alleged that Mason had not disclosed to her certain information concerning the Bank's loan of $37,500 to M & W and that, if she had been aware of such information, she would not have authorized substitution of a second deed of trust for the original deed of trust securing M & W's obligation to her. Carr asked that the Bank be prohibited from proceeding with the foreclosure sale and that her second deed of trust be made a first deed of trust constituting a lien superior to that of the Bank's.

On May 17, Carr obtained a temporary injunction prohibiting the Bank from selling the property at auction until her suit was decided and she could obtain a permanent injunction. The trial court required Carr to file with the clerk a $25,000 cash bond, on which she was principal obligor and Cuthbert, her attorney, was "surety or guarantor," to stand for any damages which the Bank "suffered as the proximate result of the injunction." The cash was paid into court; the foreclosure sale was then cancelled.

On May 23, on Carr's motion, the trial court dissolved the temporary injunction; on September 23, on her motion, the trial court dismissed her suit. After readvertising the property, the trustee sold it at public auction on December 6 for $23,650.

J. A. Wilson, Jr., President of the Bank, testified that in October 1976 he had appraised the property at $58,250 before the loan of $37,500 was made to M & W. When M & W defaulted in paying the note, the Bank notified the trustee under its deed of trust to foreclose. The sale, set for May 17, 1980, was advertised by newspaper advertisements and by handbills mailed to 70 prospective bidders. Wilson said he was authorized to bid as high as $36,000 at the scheduled sale, because the Bank was willing at that time to accept the balance of principal on the M & W note without attempting to collect accrued interest.

Wilson conceded that the primary reason for the delay in foreclosing between May 23 and September 23 was the pendency of Carr's suit against the Bank. The Bank officials felt that they could not sell the property with the suit pending. Wilson said they believed the Bank was damaged by the injunction and the underlying suit. They also hoped to sell when interest rates were low. Wilson believed that the prime interest rate was about 11½% to 12% within the month after May 17 but was 18½% on December 6.

On cross-examination, Wilson identified a table of Federal Home Loan Bank Board mortgage rates for 1979-80. This table, introduced as an exhibit by defendants, showed a mortgage rate of 13.74% in May, 1980, a rate of 11.89% in August, and a rate of 13.15% in December.

Copeland E. Adams, trustee under the deed of trust securing M & W's note payable to the Bank, testified to the procedure he followed to sell the property. He was first notified by the Bank to foreclose in March of 1980. After the foreclosure was enjoined on May 17, he took no further action until he received notice that Carr's suit had been dismissed. About October 1, when he was again notified by the Bank to proceed, he readvertised the property and sold it on December 6.

James Raymond Hawkins, a real estate salesman and developer who had 20 years experience as a utility contractor in selling water and sewer lines, testified that he investigated the property prior to May 17, 1980, to determine whether it had water and sewer lines. Over Carr's objection, he testified that in his opinion the fair market value as of May 17 was $48,000 and he was prepared to bid that high on that date. He said he only bid $20,000 at the sale on December 6 because "the economy had had a great down-turn," he had left the construction company where he had

been employed and did not have the necessary facilities to work on the property, and he thought there would be a lawsuit in which he did not care to be involved.

On cross-examination, Hawkins conceded that he assumed when he considered purchasing the lots that if he installed utility lines he, rather than the Town of McKenney, could receive the connection fees. If he could not have collected these fees, Hawkins would have been willing to pay only $21,600 rather than $48,000 for the lots. Moreover, if because of Carr's suit he could not have received good title to the property, he would not have been willing to bid on May 17.

David Jordan, real estate appraisal supervisor for the Virginia Department of Taxation, testified that during October of 1979 he assisted Dinwiddie County to reassess real estate. He assumed that water and sewer facilities would be available to the lots in question. His total appraisal of the 24 lots was $64,500 as of October 17, 1979. He was not aware of anything that would cause a change in value between his appraisal date and May 17, 1980. Assuming that it would take a purchaser five years to sell the lots, and that the purchaser would require a 12% return on his investment, he arrived at $46,501 as the fair market value on May 17, 1980, a figure he said was $64,500 discounted by $12,900 (one-fifth).

On cross-examination, Jordan agreed that he did not feel qualified to testify to the value as of May 17, 1980. He conceded that "it is not a valid comparison to compare the appraisal [he] made for assessment purposes to what it would sell for in gross at public auction at any date." He further conceded that if the lots did not have water and sewer facilities they would be worth less than comparable lots used by him in his appraisal.

Defendants moved to strike Jordan's testimony because the witness admitted he did not feel that he was qualified to testify as to the value of the lots on May 17, 1980. The trial court, construing Jordan's testimony to mean that his reason for not feeling qualified to testify to the value on May 17 was that he had not been back to the property after his 1979 appraisal, overruled the motion. The court ruled that all of Jordan's testimony must be taken into consideration in evaluating his statement that he was not qualified.

James L. Flippen, who had been a building contractor in Blackstone for 15 to 20 years, also testified for the Bank. Flippen, a

friend and business associate of Carl Mason's, had constructed three houses for Mason on three lots not involved in the present case. Flippen's understanding was that Mason would pay one connection fee to the Town of McKenney, would then install individual sewer and waterlines to the lots in question, and would charge a connection fee of $1,500 per lot.

Flippen testified that he planned to attend the May 17 sale to bid on the lots. He estimated that three of the lots had little or no value because there was no road to them. Over defendants' objection, he testified that he could justify paying $2,500 each for 16 lots and $1,500 each for five lots and that he intended, therefore, to bid as high as $47,500. According to Flippen, the Federal Housing Administration (FHA) mortgage rate was 11½% about May 17, 1980, and was about 14% on December 6. On cross-examination, Flippen conceded that in determining the maximum amount that he was willing to bid, he assumed that he would receive the connection fee of $1,500 per lot for 16 lots, a total of $31,500.

When presentation of the Bank's evidence had been completed, defendants moved to strike the evidence on the grounds that the Bank had failed to show any damages proximately caused by the injunction order and had failed to show damages attributable to the injunction order alone for which they would be liable, as distinguished from damages attributable to other causes for which they would not be liable. The trial court overruled the motion.

Doug Carr, Natalie Carr's son, testified for defendants. He introduced evidence showing that the prime interest rate was 16½% on May 17, 1980, 14½% on May 23, and 11% on July 25. It then rose to 16¼% on November 17, 17% on November 21, and 19% on December 6, the date of the foreclosure sale. The witness testified that he gained the impression from his discussion with Wilson, the Bank's president, that the present litigation was instituted out of vengeance.

Natalie Carr testified that she did not understand that she was giving up the security of a first deed of trust when the second deed of trust was executed. She did not know that the Bank was making a loan to M & W secured by a deed of trust superior to her own. She testified that Mason did not tell her about his loan from the Bank. She thought that every time Mason made a payment to her, a new deed of trust would be executed to secure her. She did

not realize until later that her security had been changed to a second deed of trust.

The balance payable to Carr on May 17, 1980, was $23,430. Carr identified the sales contract under which she sold the tract of land to Mason. The contract contained this provision: "Buyer to run city water and sewer to lots as necessary at buyer's expense. Buyer agrees to relinquish to seller any water and sewer rights in any section if buyer defaults payment for that section." Carr testified that since M & W had defaulted in its payments, the entire balance of $23,430 was due. On cross-examination, she acknowledged that she knew little about business and had signed without reading whatever M & W's lawyer placed before her.

After all the evidence had been presented, defendants again moved to strike the Bank's evidence for the reasons advanced when the motion was initially made. The trial court again overruled the motion.

■ In an action on an injunction bond, a plaintiff may recover all damages that are the natural and proximate result of the issuance of the injunction. *Va. Beach Dev. Co.* v. *Commonwealth,* 115 Va. 280, 286, 78 S.E. 617, 619 (1913). But damages are recoverable only to the extent that they may be ascertained with reasonable certainty. *Whitehead* v. *Cape Henry Syndicate,* 111 Va. 193, 196, 68 S.E. 263, 264 (1910). Properly allowable damages include only those damages that directly result from the suing out of the injunction. *Woolfolk* v. *Jones,* 216 F. 807, 810 (E.D. Va. 1914), *rev'd on other grounds,* 224 F. 673 (4th Cir. 1915). It is generally held that damages resulting from the underlying suit but not from the injunction itself are not recoverable in an action on an injunction bond. *See Greenwood County* v. *Duke Power Co.,* 107 F.2d 484, 489 (4th Cir. 1939), *cert. denied,* 309 U.S. 667 (1940); *Johnson* v. *Maryland Casualty Co.,* 177 Minn. 103, 106, 224 N.W. 700, 702 (1929); *Allen* v. *Newmarket Industrial Associates,* 96 N.H. 340, 344, 76 A.2d 920, 923 (1950); *Orr* v. *Kneip,* 287 N.W.2d 480, 486 (S.D. 1979); *Southern Ry. Co.* v. *Pardue,* 123 Tenn. 376, 380, 131 S.W. 862, 863 (1910); *Russell* v. *Tennessee & Kentucky Tobacco Co.,* 19 Tenn. App. 474, 478-79, 89 S.W.2d 907, 910 (1935) (applying *Pardue*).

■ The proper measure of a decrease in market value of property caused by delay resulting from wrongful issuance of an injunction is the difference in market value at the time it would have been sold absent any restraint and the market value when

the injunction no longer prevented the sale. This formulation allows a reasonable time following dissolution of the injunction to take necessary steps to effect the sale. *See Callaway* v. *Sparks,* 184 Okla. 569, 570, 89 P.2d 275, 277-78 (1939) (court allowed reasonable time to harvest crop for sale after expiration of injunction order). But where an unreasonable time elapses before the sale occurs, the date of the actual sale may not be used in the comparison of values since this measure might reflect a diminution in value attributable to causes other than the injunction. *See id.* at 571, 89 P.2d at 278.

In the present case, the Bank failed to meet these proof requirements. The Bank presented evidence of several causes for its delay in selling the property — the injunction, the underlying suit, and its own hope that interest rates would continue to drop. Bank officials indicated, however, that the principal reasons were the pending suit and the potential change in interest rates. In this suit on the injunction bond, the Bank may not properly recover for any loss in value occasioned by the underlying suit or a self-imposed delay. It can recover only for the decrease in value directly attributable to the issuance of the injunction. The Bank, however, offered no evidence to establish the value of the property immediately following dissolution of the injunction or a period after dissolution during which the sale could have been effected. (There was evidence that a period of two months would be sufficient to readvertise the property and conduct the sale). Nor did the Bank offer any proof of the amount of loss attributable to each cause. The plaintiff has the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery. *Hale* v. *Fawcett,* 214 Va. 583, 585, 202 S.E.2d 923, 925 (1974); *Barnes* v. *Quarries, Inc.,* 204 Va. 414, 418, 132 S.E.2d 395, 397-98 (1963). Where the loss results from several causes, the plaintiff must show within a reasonable degree of certainty the amount chargeable against a particular defendant. *Hale,* 214 Va. at 586, 202 S.E.2d at 925. If the proof is too uncertain to allow a jury to apportion the part for which the defendant is responsible, the issue should not be submitted to the jury. *Id.,* 202 S.E.2d at 925.

In this case, the court instructed the jury that it must determine whether the injunction order was the natural and proximate cause of an alleged decrease in the amount the Bank received upon foreclosure, and, if so, the amount of the decrease. But there

was no evidence of the damages solely attributable to Carr's obtaining the injunction. Therefore, the court erred in overruling defendants' motion to strike the evidence and improperly allowed the jury to assess their liability without evidence to justify the award. *Cf., Sachs* v. *Hoffman,* 224 Va. 545, 299 S.E.2d 694 (1983), and *Pebble Bldg. Co.* v. *Hopkins, Inc.,* 223 Va. 188, 288 S.E.2d 437 (1982), each holding that there was sufficient evidence to support an award of damages attributable to the defendant under the standard of reasonable certainty.

In view of this ruling, we find it unnecessary to reach the other issues raised on appeal. We will reverse the judgment of the trial court and enter final judgment for Carr and Cuthbert.

*Reversed and final judgment.*