PRESENT: All the Justices

SAKS FIFTH AVENUE, INC., ET AL.

OPINION BY
v.    Record No. 051613            JUSTICE G. STEVEN AGEE
June 8, 2006

JAMES, LTD.

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Joanne F. Alper, Judge

Saks Fifth Avenue, Inc., and Douglas Thompson (collectively "Defendants") appeal from the judgment of the Circuit Court of Arlington County, which held them jointly and severally liable in damages to James, Ltd., Thompson's former employer, for breach of fiduciary duty and violation of Code §§ 18.2-499 and -500 (prohibiting conspiracy to injure another's business).[1] For the breach of fiduciary duty and statutory violations, the trial court awarded James the sum of $548,611 in compensatory damages, which was trebled pursuant to Code § 18.2-500 for a total damage award of $1,645,833 plus costs, attorney's fees, and expenses. At issue in this appeal is whether the trial court erred in denying Defendants' motions to strike James' evidence of damages and in adopting James' calculation of damages. For the reasons set forth below, we will reverse the judgment of the trial court.

I.    BACKGROUND AND MATERIAL PROCEEDINGS BELOW

---

[1] Thompson was also adjudged individually liable for breach of his contractual duty to James under a covenant not to compete

James, a high-end men's clothing retailer, initiated the underlying suit after Thompson left his employment at James' store in the Tysons Galleria shopping mall to work at a Saks Fifth Avenue store located in the same mall. James prides itself in serving a niche market of high-end shoppers who appreciate its intimate setting, impressive selection of fine men's clothing, and personalized service.[2] In order to retain employees with the expertise necessary to excel in serving James' customers, James provides a competitive base salary and commissions, plus an array of benefits that are "rare" in the retail clothing industry. Many of its employees have worked at James for more than fifteen years.

Thompson began working for James in 1986 at its Fair Oaks mall store, immediately after he finished college and with only limited retail experience. Two years later, he transferred to James' Tysons Galleria store, where he remained until the fall of 2003. Thompson became James' highest-selling salesman, with average annual sales near $1 million during the three years prior to his departure. Thompson had between 40 and 50 "core customers," with whom he had a regular and long-standing sales

_____

and subject to an injunction, but the trial court awarded no monetary damages for that breach. See note 10, infra.

[2] A significant portion of James' business consists of selling "made-to-measure" men's suits, which allows James to record customers' sizes and preferences so that future purchases

relationship.  Approximately 30% of Thompson's sales came from one-time, walk-in customers.  The rest of his customers consisted of seasonal and other infrequent shoppers.

In 1998, James distributed a "General Employee Guidelines, Policies, Practices and Benefits" handbook to all of its employees.  The handbook provided that all James' employees, including Thompson, were "at-will" employees.[3]  A "memorandum of understanding on confidentiality" was contained in the handbook, which reserved James' proprietary interest in: "customer names and lists, trade books, financial and pricing information, and all matters discussed at our meetings.  This list is not exclusive.  Assume that all private business information is included."  The handbook also contains a covenant not to compete, which states:

> [b]y agreeing to work for JAMES, an employee agrees
> also that upon leaving the employment of JAMES, for
> any reason, he or she will not own, operate or be
> employed by a retail men's clothing store, or men's
> clothing sales department of a store, which is located
> within a one (1) mile radius of any JAMES store, for a
> period of three (3) years following termination of
> employment with JAMES.

---

could be made without returning to the store.  Approximately 40% of Thompson's total sales came from "made-to-measure" clothing.

[3] The handbook specifically states: "THIS IS NOT A CONTRACT OF EMPLOYMENT.  ALL EMPLOYEES ARE EMPLOYED 'AT WILL' AND ARE EMPLOYEES OF THE CORPORATION."  It later clarifies that "[e]mployees may resign from the company at any time, for any reason."

On May 1, 1998, Thompson signed a document "agree[ing] to all provisions, particularly the confidential information/trade secret and restrictive covenant terms, and acknowledg[ing] that employment is 'at will.' "  As specific consideration for signing this document, James gave Thompson and other employees cash bonuses and clothing allowances.

Saks is a nationwide retailer that has operated a store in Tysons Galleria since 1988; however, the store was less profitable than the sales projections of Saks' corporate management.  In 2003, Saks' management initiated several plans to foster higher profitability for the Tysons Galleria store. Although Saks is principally a higher-end women's department store, one of the profit plans was to attract top salesmen to the men's department who would expand selection and increase sales.  In the summer of 2003, Saks' managers contacted Thompson and another James employee, Ray Ybarme, to see if they could be induced to work for Saks at Tysons Galleria.

Both Ybarme and Thompson were open to the possibility of working for Saks because they knew that James had suffered financial setbacks over the previous few years due to the "downturn of the high-tech business, the stock market slump, the attacks of September 11 and the popularity of 'business casual'

4

dress codes." During the interview process[4] both Ybarme and Thompson expressed concern about the "legal ramifications" of the non-competition provisions in the James employee handbook because Saks' Tysons Galleria store was clearly within the one-mile limitation. Ybarme gave a copy of the handbook to Saks representatives, who discussed the enforceability of the policy with Saks' legal counsel. They advised the Tysons Galleria store management that they believed "the non-compete provisions in [the employee handbook] are not enforceable by James." Saks provided Thompson a letter from Saks' General Counsel, which was also signed by the Tysons Galleria general manager, agreeing to provide "any legal defense and costs necessary to accept and continue employment at Saks should [he] be challenged by James on the non-compete provision."

Saks management was excited about the prospect of hiring two individuals of Ybarme's and Thompson's experience. Internal e-mails discussed the need to "do whatever it takes to get these guys," including stocking the merchandise they recommended in order to "keep their client base." After a few meetings with

---

[4] Although Ybarme and Thompson interviewed and negotiated for employment with Saks during the same period of time, they did not have any joint meetings with Saks representatives.

Saks' managers, both Thompson and Ybarme agreed to work at the Saks Tysons Galleria store.[5]

Thompson resigned from James on September 30, 2003 and began working at Saks' Tysons Galleria store on October 9, 2003. Thompson took his customer listings when he left James and later sent e-mails to some of his former James customers informing them that he was now working for Saks in the same shopping mall as James.[6] From October 2003 through January 2005, Thompson made at least $780,000 in sales at the Saks Tysons Galleria store.

On December 11, 2003, James filed a bill of complaint against the Defendants alleging breach of fiduciary duty, intentional interference with contractual relations, intentional interference with prospective business and contractual relations, violation of Virginia's Uniform Trade Secrets Act (Code § 59.1-336 et seq.), violation of Virginia's Computer Crimes Act (Code § 18.2-152.7), and conspiracy to injure another in a business, trade or profession (Code §§ 18.2-499 and -500). James also alleged a breach of the terms and conditions of

---

[5] Thompson and Ybarme individually informed one of James' principals, Michael Colen, that they were resigning and going to work for Saks. Colen persuaded Ybarme to remain at James, in part by increasing his compensation, but Thompson declined to do so.

[6] For many years and with the knowledge and consent of James management, Thompson kept some client records organized on his personal laptop computer. Thompson thus had access to this information, which included customer contact information, after leaving James.

James' employee handbook as to Thompson alone and requested specific performance of its covenants. James sought injunctive relief, compensatory and punitive damages, and attorneys' fees and costs.

A bench trial took place in January 2005. Bruce G. Dubinsky, a certified public accountant, testified as an expert witness in forensic accounting for James regarding the damages James claimed were due from the Defendants. After reviewing James' financial statements and sales records, Dubinsky calculated that James' damages were $1,477,895 over the period from October 2003 through January 2015. In calculating James' damages, Dubinsky relied on a "but-for" analysis, which he also referred to as a "lost volume method."

Based on a historical analysis of Thompson's sales while at James, Dubinsky first calculated Thompson's projected sales on the assumption that Thompson had remained at James.[7] Then, using sales records, Dubinsky calculated the average amounts Thompson's former customers continued to spend at James after his departure, terming sales revenues from those customers "house sales." Dubinsky subtracted those "house sales" that were not "lost" from the amount of projected sales Thompson

---

[7] To arrive at this number, Dubinsky averaged Thompson's total monthly sales over his last three years at James, which Dubinsky characterized as an "extremely conservative" baseline in light of Thompson's actual sales dating back to 1997.

would have made had he remained at James. Dubinsky then calculated James' estimated gross profit lost by multiplying Thompson's projected sales by James' average gross profit margin of 43.63%. Dubinsky subtracted the incremental costs that would have been incurred to generate the additional sales, but added to damages the incremental increases in other employees' base pay James gave after Thompson left. This calculation generated Dubinsky's determination of James' net lost profits for the first year following Thompson's departure. Dubinsky then projected James' lost profits through 2015, assuming an annual 2% growth in revenues, which he then discounted to a total present value of $1,477,895.

On cross-examination, Dubinsky clarified that "[i]t wasn't important to [his] analysis" whether customers that Thompson served at James actually followed Thompson to Saks. Dubinsky characterized his method of assessing damages as the "but-for" method in which James' damages would be based on "where Mr. Thompson's sales would have been." In other words, "but for" Thompson's departure to work at Saks, James would have had sales equal to the amount "if Mr. Thompson had remained." Thus, Dubinsky did not analyze whether Thompson's former customers at James actually shopped at Saks after Thompson's departure from James, even though Dubinsky had access to a list of Thompson's customers at Saks.

8

Dubinsky further admitted that his analysis assumed that every customer Thompson had served at James who did not purchase something at James after Thompson left was "gone due to the actions of Mr. Thompson and Saks." Dubinsky also testified that he did not differentiate between "customers who were regulars for Mr. Thompson and customers who were either walk-ins or very sporadic" customers. Nor did Dubinsky consider customer attrition rates in calculating damages because, as Dubinsky testified,

> [his] lost profits calculation specifically looks at Mr. Thompson's sales, [and] the historical level of sales from Mr. Thompson as well as James . . . is very referral-based [and] you don't see a drop-off every year of customers just leaving. . . . [I]n the historical pattern of sales here, some customers will leave. They may die. They may move away. But other customers may be referred. And typically, that has been the case. . . . So I considered that and didn't directly, then, quantify one by one . . . . I looked from a macro level based on the history of where things had been.

At the close of James' case, the Defendants moved to strike James' evidence regarding, inter alia, proof of damages.[8] They argued James' calculation of damages was speculative because it assumed future business from customers who had no obligation to shop at James and had not shopped with Thompson at Saks. In

---

[8] Defendants also moved to strike the evidence of each count James alleged in the bill of complaint. The trial court granted the motion with respect to the counts regarding the Uniform Trade Secrets Act and Computer Crimes Act, but denied the rest of the motion.

addition, they asserted that Dubinsky's calculations "ignore[d] James' burden of proving causation" and that James had not proven that "Mr. Thompson's or Saks' conduct caused the loss of any of James' customers." The trial court denied Defendants' motion, stating:

> I believe that there has been sufficient evidence and sufficient expert testimony, plus evidence of other witnesses from James, to support the damages claimed so far.
>
> The issue is not so much that the customers left James and went to Saks. It's the fact that they're not at James, and the argument that Mr. Thompson, by his actions . . . caused the loss of those individuals regardless of where they went, whether they went to Saks or Neiman's or Macy's or anywhere else, I think supports at this point the allowance of the damages evidence, and the damages evidence is supported at this stage of the proceeding and is not so speculative or uncorroborated as to require the striking of all of the evidence on damages.

The Defendants then presented their evidence, including an expert witness, Richard Edelman, who testified that James suffered "small and insignificant" damages as a result of Defendants' actions. This was so, he asserted, because a comparison of Thompson's customer lists at each store indicated that only 48 of Thompson's customers at James spent more at Saks than at James following Thompson's departure.[9] His calculation

---

[9] Thompson had previously testified how they had analyzed his customer lists from James and Saks. The 48 customers identified were those individuals from the original list of 1782 customers that Thompson had served at least one time at James who had not made purchases at the Tysons' Saks men's department

10

of damages was based solely on these sales of former James customers that were "lost" to Saks. The trial court "found Dr. Edelman's testimony to be singularly unconvincing." Defendants renewed their motion to strike at the close of all the evidence, which the trial court denied.

The trial court's May 6, 2005, final decree incorporates by reference its detailed letter opinion dated March 8, 2005, which articulated findings of fact and conclusions of law. The trial court found in favor of James and against Thompson individually, as to the enforceability of the employee handbook's restrictive covenant. The trial court further found in favor of James and against the Defendants, jointly and severally, as to the counts for breach of fiduciary duty and violation of Code §§ 18.2-499 and -500.[10] The trial court found for the Defendants on the remaining counts of intentional interference with contractual

---

prior to Thompson's working there and who had spent more on purchases at Saks than at James since that time.

[10] Having found Thompson individually liable for breach of the restrictive covenant in James' employee handbook, the trial court enjoined Thompson "from working at Saks' Tysons Galleria store for a period of three years beginning one week after the date of issue of the March 8, 2005 letter opinion." We refused Thompson's petition for appeal assigning error to the trial court's enforcement of the restrictive covenant and award of the injunction; accordingly, this portion of the trial court's judgment is not before the Court and is not affected by our resolution of the issues in the present appeal.

11

relations, intentional interference with prospective business and contractual relations, and conversion of James' property.[11]

Because the analysis of damages for breach of fiduciary duty and violation of Code §§ 18.2-499 and -500 was "identical," the trial court addressed them together. The trial court found that James had met its burden of proving cognizable damages because Dubinsky had "testified that James suffered damages of almost $1.5 million in lost profits, and that those damages were directly attributable to the resignation of Thompson and loss of his long standing, high volume customer sales." The trial court opined "that the damage analysis in this case should be guided by the Supreme Court's ruling in Worrie v. Boze, 198 Va. 533[, 95 S.E.2d 192] (1956)." Also citing Advanced Marine Enterprises, Inc. v. PRC Inc., 256 Va. 106, 501 S.E.2d 148 (1998), and Famous Knitwear Corp. v. Drug Fair, Inc., 493 F.2d 251 (4th Cir. 1974), the trial court concluded that these cases established that the "but for" method of calculating lost profits was appropriate in cases where the plaintiff's business had been profitable prior to the wrongful acts of the Defendants. Accordingly, the trial court determined that James

---

[11] With respect to the claim of conversion, the trial court entered judgment for the Defendants because it found that the claim had "been adequately and completely addressed in [the trial court's] rulings on the other claims in the Bill of Complaint, and that the damages to be awarded to [James] will

"ha[d] proven a sound factual and legal basis for the award of damages against" Defendants.

The trial court adopted Dubinsky's calculation of damages and awarded damages to James "for a period of approximately three years from the date of Mr. Thompson's departure, October 1, 2003." Based on Dubinsky's calculations, the trial court awarded James the sum of $548,611, which was trebled pursuant to Code § 18.2-500 to $1,654,833. In addition, the trial court awarded James statutory costs and attorneys' fees and expenses.

We awarded the Defendants this appeal.

## II. ANALYSIS

### A. The Parties' Arguments

Defendants contend that James failed to satisfy its burden of "proving with reasonable certainty the amount of damages and the cause from which they resulted." This is so, they argue, because James' proof of damages relied solely on Dubinsky's calculation of damages, which was not based on any causal connection to Defendants' wrongful conduct.[12]

Defendants aver that Dubinsky instead calculated James' damages as if they "stemmed entirely from Thompson's resignation" although Thompson was an at will employee and was

fully and fairly compensate it for the wrongful actions of [the Defendants]."

[12] For purposes of this appeal, the trial court's findings of wrongful conduct by the Defendants are not at issue.

legally entitled to resign at any time.  Consequently,
Defendants assert that Thompson's leaving the employ of James
cannot be the basis for James' damages.  Defendants cite to
Dubinsky's testimony that his calculation of damages was derived
from the projected sales James lost because Thompson no longer
worked there.  Factors such as "which [James] customers had been
contacted by Thompson, which ones had shopped at Saks with
Thompson, or which ones even knew that Thompson had resigned
from James [were not] 'important to [his] analysis.'"  In
effect, Defendants say Dubinsky's calculation of James' damages
is merely a projection into future years of the total sales
James would have achieved on the assumption Thompson had
remained employed there and produced sales at his historical
levels.  Thus, Defendants contend Dubinsky's damages calculation
is not based on any proximate causation by Defendants' wrongful
acts.

Defendants maintain that the trial court's reliance on
Worrie to support its decision is erroneous because neither
Worrie nor any other case "relieve[s] James of its burden to
prove non-speculative damages proximately caused by Thompson's
and Saks' wrongful conduct; nor do they permit it to rely on
inadmissible expert testimony."  Defendants distinguish Worrie
by observing that prior to the defendants' wrongful conduct in
that case, the plaintiff did not have any competition, and in

effect held a monopoly in the area. Defendants argue these "unique facts" allowed the trial court in <u>Worrie</u> to infer that the plaintiffs' decrease in business was proximately caused by defendants' wrongful conduct and to measure damages on the basis of projected lost profits.

James responds that "[Defendants] should not now be heard to complain that James was not entitled to recover damages, when their intentional and improprietous actions caused injuries and those same acts made the proof of damages with any certainty difficult, if not impossible." James contends that Virginia's "long established precedent from cases in which lost profits were being sought as damages" permits "evidence of the prior and subsequent record of [an established] business [as] an intelligent and probable estimate of damages." Dubinsky's calculations, James argues, were based on this established foundation and the trial court acted properly in admitting Dubinsky's testimony and subsequently relying on it to determine James' damages. James claims that there is "no practical way that a plaintiff who makes sales to an established patronage and who is victimized by the calculated wrongdoing of others could prove the future intentions of its customer base."

James asserts that Defendants' arguments are contrary to Virginia precedent and it defends the trial court's reliance on <u>Worrie</u>. In further support of its position, James cited at oral

15

argument and on brief to R.K. Chevrolet, Inc. v. Hayden, 253 Va. 50, 480 S.E.2d 477 (1997).

Defendants also assert that Dubinsky's opinion testimony was improperly admitted because his calculations were based on several speculative or false assumptions. However, because we find the issue of causation is dispositive in this case, we do not recite or address the parties' arguments regarding whether Dubinsky's opinion calculating damages was admissible.

B.  Discussion

We review the trial court's decision to deny the motion to strike in accordance with well-settled principles:

> When the sufficiency of a plaintiff's evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in plaintiff's favor and should grant the motion only when "it is conclusively apparent that plaintiff has proven no cause of action against defendant," or when "it plainly appears that the trial court would be compelled to set aside any verdict found for the plaintiff as being without evidence to support it."

Williams v. Vaughan, 214 Va. 307, 309, 199 S.E.2d 515, 517 (1973) (citations omitted).

At trial, James had the "burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery." Shepherd v. Davis, 265 Va. 108, 125, 574 S.E.2d 514, 524 (2003) (quoting Carr v. Citizens Bank & Trust Co., 228

16

Va. 644, 652, 325 S.E.2d 86, 90 (1985)).  When an established business, such as James, is "injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business by reason of the wrongful act, measured by the loss of the usual profits from the business."  United Constr. Workers v. Laburnum Constr. Corp., 194 Va. 872, 891, 75 S.E.2d 694, 707 (1953) (internal quotation omitted).  Thus,

> where the loss of prospective profits is the direct
> and proximate result of the breach . . . and they can
> also be proved with a reasonable degree of certainty,
> such loss is recoverable, but it is equally well
> settled that prospective profits are not recoverable
> in any case if it is uncertain that there would have
> been any profits, or if the alleged profits are so
> contingent, conjectural, or speculative that the
> amount thereof cannot be proved with a reasonable
> degree of certainty.

Sinclair Refining Co. v. Hamilton & Dotson, 164 Va. 203, 211, 178 S.E. 777, 780 (1935) (citing Manss-Owens Co. v. H. S. Owens & Son, 129 Va. 183, 201-05, 105 S.E. 543, 549-50 (1921)).

A plaintiff thus must prove two primary factors relating to damages.  Shepherd, 265 Va. at 125, 574 S.E.2d at 524.  First, a plaintiff must show a casual connection between the defendant's wrongful conduct and the damages asserted.  Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages.  See United Constr. Workers, 194 Va. at 891, 75 S.E.2d at 707.  Our

17

disposition of the causation factor makes it unnecessary for us to address the factor for calculating damages.

James bore the burden of proving that its damages were "proximately caused by wrongful conduct." Hop-In Food Stores, Inc. v. Serv-N-Save, Inc., 247 Va. 187, 190, 440 S.E.2d 606, 608 (1994). James alleged, and the trial court found, that Thompson violated the terms of a valid non-competition covenant and breached his fiduciary duty of good faith and loyalty by providing Saks with confidential information and taking proprietary client information. Saks, having facilitated Thompson's actions, was also liable to James for Thompson's breach of fiduciary duty and both parties conspired to "willfully and maliciously injur[e] another in his reputation, trade, business or profession by any means whatever," in violation of Code §§ 18.2-499 and -500. James was thus entitled to recover damages that were "the direct and proximate result" of that conduct. However, by relying solely on Dubinsky's opinion evidence as to damages, James failed to carry its burden of proving that the wrongful conduct of Saks and Thompson proximately caused those damages.

Dubinsky failed to connect the lost profits he claimed James incurred after Thompson's departure to anything other than the mere fact that Thompson was no longer working at James. This fact alone cannot be a basis for recovering damages,

18

however, because Thompson was an at will employee who was free to stop working at James at any time.

Rather than being connected to Thompson's employment at Saks, solicitation of James' customers, or removal of James' confidential information, Dubinsky's calculation of damages focuses solely on a "but-for" model of what James' profits would have been had Thompson remained employed there. Under Dubinsky's analysis, James' damages were the same regardless of whether Thompson left to work at the Saks store in the same shopping mall or simply retired. Having neglected to show that its lost profits corresponded to the Defendants' wrongful conduct, James failed to show the necessary factor of proximate causation and thus did not carry its necessary burden of proof as to damages. See, e.g., Carr, 228 Va. at 652-53, 325 S.E.2d at 90-91 (rejecting trial court's denial of motion to strike where "there was no evidence of the damages solely attributable to [the defendant's wrongful conduct]"); Barnes, 204 Va. at 417-20, 132 S.E.2d at 397-99 (approving trial court's denial of damages award because plaintiff failed to prove with reasonable certainty "that the damages sought resulted from the act complained of").

Accordingly, the trial court's reliance on Worrie, Advanced Marine, and Famous Knitware, is inapposite. Those cases concern the proper measure of damages and calculating lost profits, but

do not affect a plaintiff's required burden of proving that those damages were caused by a defendant's wrongful conduct in the first place.

In Worrie, "[b]ut for the acts of the defendants . . . the plaintiffs would have been without competition in Richmond." 198 Va. at 543, 95 S.E.2d at 200.  Consequently, we found that

> the jury had the right to infer from the evidence that [the] decrease in the plaintiffs' business was a proximate result of the competition from the defendants' studio.  Since . . . the plaintiffs' business had been profitable prior to the opening of the defendants' studio, and continued to be profitable thereafter, the jury had the right to infer that but for this competition by the defendants the plaintiffs' profits would have been even greater.

Id.  In a two-competitor market, all the plaintiffs' lost profits were reasonably attributed to the defendants because they proximately caused the plaintiffs' loss of a de facto monopoly by their wrongful conduct.  James failed to make a similar showing that its projected lost profits were caused by Defendants' wrongful conduct.

Our decisions in Advanced Marine and Famous Knitware are unrelated to the issue arising in this case because the factor of proximate causation of damages was not at issue in those cases.  James' reliance on R.K. Chevrolet is similarly unavailing.  Had Thompson been party to a contract of employment with James that required he work there for the period over which Dubinsky projected damages, this case might be more analogous to

20

R.K. Chevrolet because the failure to fulfill the contractual obligation could establish the proximate causation of damages. However, no such contractual obligation bound Thompson as an at-will employee so no proximate causation factor can be established.

### III. CONCLUSION

The record before us shows that James relied only on the testimony of its expert witness, Dubinsky, to establish damages. Dubinsky's opinion on damages was solely based on Thompson having ceased employment with James, not the wrongful acts of the Defendants. Thus, Dubinsky's opinion did not establish the necessary factor of proximate causation between Defendants' conduct and the damages claimed by James. The trial court thus erred in denying the motion to strike James' evidence.

Accordingly, we will reverse that part of the trial court's judgment finding Defendants jointly and severally liable in damages for breach of fiduciary duty and violation of Code §§ 18.2-499 and -500, and will enter final judgment in favor of Defendants.[13]

---

[13] Other than Dubinsky's expert testimony, James presented no other evidence "to support an award of damages." See Vasquez v. Mabini, 269 Va. 155, 163, 606 S.E.2d 809, 813 (2005). The testimony of Defendants' witness, Edelman, as to de minimis damages was rejected by the trial court and no error was assigned to that finding. Thus, Defendants are entitled to final judgment on the issue of damages. See Countryside Corp. v. Taylor, 263 Va. 549, 553-54, 561 S.E.2d 680, 682 (2002).

21

<u>Reversed and final judgment.</u>