Present: Hassell, C.J., Keenan, Koontz, Lemons, and Millette, JJ., and Carrico, and Lacy, S.JJ.


SUNTRUST BANK, INDIVIDUALLY
AND AS TRUSTEE OF THE TRUST
UNDER THE LAST WILL AND TESTAMENT
OF CHARLES E. WILSON, DECEASED

OPINION BY
v.   Record No. 080550     JUSTICE LEROY F. MILLETTE, JR.
April 17, 2009
SYDNEY D.F. FARRAR, ET AL.


FROM THE CIRCUIT COURT OF NOTTOWAY COUNTY
Thomas V. Warren, Judge

In this appeal, we consider whether the circuit court erred in entering a monetary judgment against the trustee and in favor of the beneficiaries of a trust for breach of fiduciary duty arising from the management of a coal mining property when the only evidence of damages presented by the beneficiaries was based on an appraisal without evidence of a willing buyer at the appraised value.

BACKGROUND

Charles E. Wilson (Mr. Wilson) died in 1921, survived by his wife, Mary C. Wilson, and two sons, Charles Everett Wilson, Jr. (Everett) and Richard B. Wilson (Richard).  In his will, Mr. Wilson established a trust (the Wilson trust) that contained land in Harlan County, Kentucky (the property), upon which a coal mine (the coal mine) was located.  Old Dominion

Trust Company in Richmond, Virginia, now SunTrust Bank (the Trustee), was named as co-trustee, along with Mrs. Wilson.[1]

The property was the sole principal asset of the Wilson trust from 1921 until it was sold in 1997. Believing there to be "no safer or more permanent or more profitable investment," Mr. Wilson used strong language in his will directing the co-trustees to hold the coal mine "unless conditions undergo a very radical change from what they are at present." According to the will, the income from the coal mine was to be paid to Mrs. Wilson, Everett, and Richard, during their lifetimes.[2] Following their deaths, the income would be distributed to Mr. Wilson's remaining beneficiaries. The Wilson trust was to terminate 20 years from the date of death of the last of the three income beneficiaries, and income and principal distributed to "such persons as shall at that time be [Mr. Wilson's] heirs at law under the Virginia Statute of Descents and Distributions."

Everett, who became the last surviving income beneficiary, died in 1984. Following Everett's death, the Trustee petitioned the Circuit Court of Nottoway County to terminate the Wilson trust or, in the alternative, to obtain authority to

---

[1] Mrs. Wilson died in January 1976, leaving only the Trustee charged with the administration of the Wilson trust.
[2] Richard died in 1926.

sell the property and reinvest the proceeds into "more profitable and safer investments."

At the June 1987 hearing, in support of its petition, the Trustee presented evidence that the coal mine's income had dropped significantly in the preceding few years.[3]  Hartwell Harrison, the Trustee's vice president and administrative officer responsible for the Wilson trust since 1983, testified that the trust was on an August fiscal tax year and from September 1983 to August 1984, the trust had a total income of approximately $113,000, the vast majority of which was income from the property.  For the fiscal tax year 1984 to 1985, the trust income, which was still primarily income from the property, was approximately $110,000, but dropped to $52,000 for the fiscal tax year 1985 to 1986 and down to $13,000 from September 1986 to May 1987.  Harrison acknowledged that the "income ha[d] dropped quite drastically."  When asked "generally how the assets of th[e] trust could be converted into safer and more profitable investments," Harrison replied that "the bank would pro[b]ably use a balanced approach, and a balanced approach would mean an allocation of the [proceeds from the sale of the property] between common stocks of maybe

---

[3] The Honorable Thomas V. Warren also presided over the 1987 hearing.

55 to 65 percent, and the balance would be exposed to fixed income securities or bonds."

William H. Eanes, head of the Trustee's real estate division with primary responsibility for the Wilson trust since 1960, testified that when Everett died in 1984, the coal market was on a "trend downward" and there had been little mining activity on the property since that time. Eanes also testified that the property was encumbered by coal mining leases, including a lease in which the lessee was "in bankruptcy." Nevertheless, Eanes stated:

> It is my opinion that the property could be sold. I think the timing of the sale is critical. I believe there is a market for the property. It is a risky asset in terms of management, a lot of labor problems associated with it, a lot of negotiations, and it is an expensive asset to manage.

Following the 1987 hearing, the circuit court entered an order granting the Trustee authority to sell the property. To accomplish a sale, the Trustee sought the assistance of Dennis D. Willis, a licensed professional engineer.[4] In 1986, the Trustee had asked Willis to appraise the property. Willis appraised it at $1.1 million "[b]ecause that [was] the value of the property . . . if all the coal was indeed there, the

---

[4] In Kentucky, Willis was classified a "professional mining engineer." It was undisputed at the trial underlying this appeal that Willis is an expert appraiser and engineer.

measured, the indicated and the inferred."[5]  The property was sold in 1997, for $350,000.

In October 2004, twenty years after Everett's death, the Wilson trust terminated.  Thereafter, the Trustee sought guidance from the circuit court regarding distribution of the trust assets to its beneficiaries.  In August 2007, beneficiary Sydney D.F. Farrar, on behalf of himself and other beneficiaries (collectively, the Beneficiaries), filed an amended complaint against the Trustee, alleging breach of fiduciary duty and seeking compensatory as well as punitive damages.  At a bench trial conducted in December 2007, the Beneficiaries maintained that for years the property could have been sold for the $1.1 million appraised value and presented evidence of damages based on that premise.

The only witness offered by the Beneficiaries at trial to prove damages was Robert W. Cook, Jr., an expert in economics. Cook testified that he gleaned the Trustee's "investment

_____

[5] At trial, Willis explained that:

> Reserves are classified as measured and proven or probable reserves and inferred reserves.  There's [sic] three classifications.  Proven or measured reserves are the most reliable because you have more measurements to take at known points. . . . [T]he indicated reserves would be further out, and inferred reserves are much further out.  They are just like the name implies, inferred.

5

philosophy" of allocating the trust portfolio between common stocks and fixed income securities or bonds from Harrison's testimony at the 1987 hearing.  Cook used this hypothetical allocation to construct investment scenarios to determine the value of the trust portfolio in 1997 if the property had been sold for $1.1 million at the time the Trustee was granted permission to sell, and the $1.1 million had been invested on September 1, 1987.  The September 1, 1987 date was suggested to Cook by the Beneficiaries' counsel, based upon the premise that since the hearing was in June 1987, it "[gave] a reasonable period of time here so that the property could in fact be sold and these investments could be made."  Cook employed the $1.1 million figure because "[t]hat's all [he] knew," but conceded on cross-examination that the $1.1 million appraised value would not actually have been placed into the investment portfolio.  Instead, what would have gone into the portfolio would have been the net proceeds after deduction of the commission on the sale.

Cook determined that if, on September 1, 1987, 65 percent of $1.1 million was invested in stocks and 35 percent in bonds, trust distributions would have been $1,761,000, and the remaining trust portfolio would contain $3,709,000 in stocks and bonds, totaling $5,470,000.  Cook testified that he used a mathematical formula to create his scenarios:

6

> Arithmetic and algebra. That is all that's required here, because I was looking back rather than in the future. The numbers that I was adding and subtracting and multiplying were known with certainty. I looked them up from documents that I had at my disposal that I researched, and then I applied some arithmetic and division that I used to get to the results.

However, Cook acknowledged that he was not testifying that on September 1, 1987 there was a buyer willing to purchase the property for $1.1 million.

Willis testified that his $1.1 million valuation took into account existing coal market conditions, which he described as in a state of decline from 1975 until 2003 or 2004. However, Willis was not aware of any buyer willing to pay $1.1 million for the property as of the 1986 appraisal. According to Willis, the property was not sold in 1987 because no one was interested in it. In addition, Willis acknowledged that "[t]he appraisal was probably somewhat high. Based upon the declining coal market it was high, but it was based upon available information at the time." Further, a sale of the property was not feasible until the termination or expiration of all of the coal mining leases encumbering the property, because there was not any production or very little production of coal on the property at that time and the leases would have a considerable negative effect on the value of the property. Willis could not

recall if he took the existence of the leases into consideration in the 1986 appraisal.

The circuit court found that the Trustee failed to appropriately market the property, allowed the coal mine to become "unproductive of income," allowed it to become a "wasting asset," and failed to diversify the trust assets in a timely manner. For these reasons, the circuit court determined that the Trustee did not act as a prudent person would, constituting a breach of its fiduciary duty to the Beneficiaries. The circuit court awarded judgment to the Beneficiaries for $2.4 million, which was "a net judgment considering [a] 5% brokerage fee, the $350,000 received from sale, [the] date of court authorization [of the sale], [the] date of sale, and accrued interest."

In a separate action on the Trustee's objections to the Commissioner of Accounts' reports, the circuit court held that the Beneficiaries' incurrence of $89,028.30 in trust expenditures from September 1992 through August 1998 resulted from the Trustee's breach of its fiduciary duty. The circuit court concluded that these expenditures, which included engineering fees in maintaining the property, would not have been incurred had the Trustee not breached its fiduciary duty by failing to sell the property and diversify the Wilson trust

portfolio.  The circuit court ordered the Trustee to reimburse these fees, with interest, to the Beneficiaries.

DISCUSSION

The Trustee assigns error to the circuit court's holding that the Trustee breached its fiduciary duty and to the damages awarded to the Beneficiaries.  The Trustee alleges that the Beneficiaries failed to prove there was a buyer willing to pay the appraised value for the property.  In addition, the Trustee contends the circuit court erred in disallowing certain engineering expenses and trustee's fees, as that ruling was based solely on the circuit court's erroneous conclusion that the Trustee breached its fiduciary duty by not selling the property and timely diversifying the trust assets.

The Trustee argues that the circuit court's judgment in effect made the Trustee an insurer of the appraised value of the property, which the evidence showed was unobtainable given the actual market conditions.  The Trustee maintains the Beneficiaries did not meet their burden of proving damages, because the award of damages was based upon the assumption that there was a willing buyer for the property at the appraised value when the circuit court granted the Trustee the authority to sell, and the proceeds of the sale would be available for investment by September 1987.  The Trustee contends that, by making this assumption, the circuit court disregarded the

9

depressed coal market conditions and other impediments to the sale of the property existing at that time.

The Beneficiaries contend the circuit court's conclusion that the Trustee breached its fiduciary duty to preserve the value of the property and to timely diversify the trust portfolio must be upheld because the circuit court's judgment is supported by sufficient evidence and is not plainly wrong. The Beneficiaries assert that the Trustee failed to market the property in a manner that satisfied the prudent person standard, and sold the property at a sacrificial price of $350,000 despite its appraised value of $1.1 million. According to the Beneficiaries, no law exists to support the Trustee's contention that the damages award must be reversed because the Beneficiaries failed to show that there was a buyer willing to pay the appraised value.

It is well-settled that when a decision is rendered following a bench trial and a party objects to the ruling on the ground that it is contrary to the evidence, the judgment shall be upheld unless it appears from the evidence to be plainly wrong or without evidence to support it. Pizzarelle v. Dempsey, 259 Va. 521, 527, 526 S.E.2d 260, 263 (2000); Code § 8.01-680. We hold that the circuit court's judgment was erroneous, because the Beneficiaries failed to meet their burden of proof on the issue of damages.

10

The Beneficiaries, as the plaintiffs below, had the "'burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery.'" Shepherd v. Davis, 265 Va. 108, 125, 574 S.E.2d 514, 524 (2003) (quoting Carr v. Citizens Bank & Trust Co., 228 Va. 644, 652, 325 S.E.2d 86, 90 (1985)); Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 156, 671 S.E.2d 132, 136 (2009). Damages cannot be recovered if derived from uncertainties, contingencies, or speculation. Saks Fifth Avenue, Inc. v. James, Ltd., 272 Va. 177, 188, 630 S.E.2d 304, 311 (2006); Shepherd, 265 Va. at 125, 574 S.E.2d at 524. In Shepherd, we held that the evidence of damages was speculative because the calculations submitted were based on the assumption that the property could be sold to a large, well-known home and building supply retailer. 265 Va. at 125, 574 S.E.2d at 523-24. Likewise, in this case, the evidence of damages was premised on the assumption that the property could have been sold for $1.1 million in 1987.

Although there was testimony from a developer regarding an offer to purchase the property in Shepherd, 265 Va. at 125-26, 574 S.E.2d at 524, damages calculated from that offer were rejected because of the need for rezoning and other contingencies rendering the valuation speculative. Here, the Beneficiaries presented no evidence that there was a buyer

11

willing to purchase the property, regardless of the encumbrances, for $1.1 million in 1987 or at any time whatsoever. In fact, evidence to the contrary was presented to the circuit court. Willis, the expert appraiser and engineer, and Cook, the Beneficiaries' economics expert, each testified that he was not aware of the existence of such a buyer. Willis specifically testified that the property was not sold in 1987 because "no one was interested in it."

Nowhere in the record of this case is there evidence of a willing buyer or other proof to show the existence of a viable market for the property at the appraised price. This Court has held that damage calculations based on unsupported projections are improper. See Saks Fifth Avenue, Inc., 272 Va. at 187, 630 S.E.2d at 310. Estimates of damages based entirely upon such assumptions "are too remote and speculative to permit 'an intelligent and probable estimate of damages.'" Vasquez v. Mabini, 269 Va. 155, 159, 606 S.E.2d 809, 811 (2005) (quoting Bulala v. Boyd, 239 Va. 218, 233, 389 S.E.2d 670, 677 (1990)).

Willis described the depressed coal market in Harlan County, Kentucky during the relevant period. He explained that the coal market peaked in 1974 and 1975 due to an oil embargo that caused coal prices to escalate rapidly. After the embargo ended, the coal market was in a continuous state of decline

12

until 2003 or 2004. Eanes confirmed that by the end of the 1980s, "the bottom had fallen out" of the coal market.

Willis testified that he was familiar with the coal market in Harlan County in 1986, and that the price per ton of coal continued to decline from the 1970s peak. Willis wrote a letter dated February 11, 1987 to Eanes, informing him that "[i]n recent months, it has come to our attention that the depressing coal market has caused a decrease in the activity on the C. E. Wilson Estate property." In an interoffice memorandum written in April 1987, with "C.E. Wilson Estate – 1600 Acres in Harlan, KY" as the subject, Eanes stated:

> At present, due to the depressed coal market, there [is] little or no mining activity on the property or in the area. . . . Coal is selling for $19.00 to $20.00 per ton; the cost to mine the coal is almost $19.00 – $20.00 per ton so it is not economically feasible to mine and sell coal in today's market at a profit.

At trial, Eanes testified that "[a]ny purchaser would buy the property for the reserves, but if he couldn't mine the reserves and he couldn't sell the coal, it had a very negative impact on the ability to sell the property."

Although the Trustee introduced only scant evidence of its efforts to market the property from 1987 to 1997, the Beneficiaries presented even less evidence as to anyone's reasonable interest in purchasing the property. Based upon the

13

lack of evidence of a market for the property, it is impossible to conclude that anything the Trustee did or did not do caused any damage to the Beneficiaries.  We have cited with approval the legal principle that a trustee who retains a trust asset during a "'precipitous decline in the market,'" when there was no market for the asset, "'cannot be held to account,'" so long as the trustee acted as a reasonable and prudent person would act in light of then existing conditions.  Harris v. Citizens Bank & Trust Co., 172 Va. 111, 125-26, 131, 200 S.E. 652, 657, 659 (1939) (quoting In Re Pettigrew's Estate, 171 A. 152, 155 (1934)).

To appraise the property in 1986, Willis had employed present worth, price per ton, and comparable sales approaches. However, the present worth and price per ton approaches utilized estimates only, and the comparable sales Willis relied upon were sales in 1979 and 1980, when the uncontroverted testimony was that the coal market was in a continuous state of decline from 1975 until 2003 or 2004.  While comparable sales often provide the soundest basis for an appraisal, in a declining market, sales completed six or seven years prior to the appraisal date cannot provide an accurate means of valuation.  The comparable sales were also of properties "much larger than the C.E. Wilson Estate."

14

The goal of an appraisal is to reflect the fair market value of the subject property.  "We have defined the fair market value of a property as its sale price when offered for sale 'by one who desires, but is not obliged, to sell it, and is bought by one who is under no necessity of having it.'" Keswick Club, L.P. v. County of Albemarle, 273 Va. 128, 136, 639 S.E.2d 243, 247 (2007) (quoting Tuckahoe Woman's Club v. City of Richmond, 199 Va. 734, 737, 101 S.E.2d 571, 574 (1958)).  The record is devoid of sufficient evidence to substantiate the $1.1 million appraisal.  Eanes' testimony at the 1987 hearing that the property "could be sold" and that there was "a market for the property," without factual support, was insufficient to show there was a willing buyer.

The earliest evidence of a willing buyer for the property was an offer in October 1992 for $75,000.  Thereafter, the following offers were made:  August 1996 – $281,190, November 1996 – $25,000, and March 1997 - $100,000.  The last offer was countered by the Trustee at $350,000 and accepted in May 1997. The record contains no evidence of a willing buyer prior to 1992 or of a buyer at any time willing to pay close to $1.1 million for the property.  With no evidentiary support for the $1.1 million figure, and evidence contrary to the accuracy of the appraisal, it was an improper figure to serve as the expert's foundation for the damages award.

15

The circuit court's order that the Trustee reimburse $89,028.30, plus interest, in engineering fees and trust expenses from 1992 through August 1998 rested on its conclusion that the Trustee's failure to sell the property and timely diversify the Wilson trust portfolio resulted in additional damages to the Beneficiaries. We need not resolve the issue of whether the Trustee breached its fiduciary duty to the Beneficiaries, because the Beneficiaries failed to present sufficient evidence that a sale of the property before 1997 was possible, and therefore failed to prove damages. Since there was insufficient evidence to show that any action or inaction by the Trustee resulted in a failure to sell the property prior to 1997, and to invest the sale proceeds to accomplish diversification, there is insufficient evidence to support the circuit court's order that the Trustee repay fees and expenses incurred in maintaining the property.

## CONCLUSION

The circuit court erred in awarding damages to the Beneficiaries for breach of fiduciary duty on this record, which contained no evidence supporting the appraiser's assumption and premise that there existed a willing buyer or other circumstances creating a viable market at the appraised or other reasonable value to enable the Trustee to diversify the Wilson trust portfolio in 1987. For the reasons stated, we

16

will reverse the judgment of the circuit court and enter final judgment in favor of the Trustee.

<u>Reversed and final judgment.</u>