Present:  All the Justices

ANTHONY COLLELO

v.  Record No. 101411        OPINION BY JUSTICE DONALD W. LEMONS
                                      January 13, 2012[*]
GEOGRAPHIC SERVICES, INC.

GEOGRAPHIC SERVICES, INC.

v.  Record No. 101421

ANTHONY COLLELO, ET AL.

                    FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                           R. Terrence Ney, Judge

     In these appeals, we consider whether the Circuit Court of

Fairfax County erred when it: (1) granted the motion to strike

filed by the Boeing Company, Autometric, Inc., and Anthony

Collelo (together, "the defendants") and dismissed the suit by

Geographic Services, Inc. ("GSI") against the defendants,

alleging breach of contract, tortious interference with a

contract, and violations of the Virginia Uniform Trade Secrets

Act, Code §§ 59.1-336 through -343 ("the Trade Secrets Act");

and (2) denied the motion for attorneys' fees made by Anthony

Collelo ("Collelo").

                        I. Facts and Proceedings Below

     GSI subcontracts with various United States government

prime contractors, including the Boeing Company ("Boeing"), to

perform what is known as geographic names, or "geonames," work.

_____

     [*] As amended by Order of the Court dated March 6, 2012.

Specifically, geonames work includes referring to a specific named feature on a map, and entering information about that feature into a spreadsheet. The spreadsheet contains up to thousands of pieces of data including, among other things, the name of the map feature, the feature's location and type, and the language used on the map. Once all of the map feature information is collected and verified, GSI then submits the spreadsheet to the prime contractor or the United States government, through the National Geospatial Intelligence Agency, which then uploads certain geonames information to a publicly accessible website, commonly referred to as the Geographic Names Data Base.

GSI's geonames work requires it to generate large quantities of data that must be as accurate as possible. Accordingly, GSI has developed a systematic method for performing geonames work, including identifying and correcting errors in the data entered into the spreadsheet. GSI calls this its "Geographic Names Procedure" ("GNP") and has memorialized its GNP in several documents.

GSI's GNP includes a data entry step known as Research Librarian ("RL"), a quality control ("QC") step, and a quality assurance ("QA") step. In the RL step, GSI reviews each named feature on a map, such as a city or body of water, and enters the relevant data about that feature into a spreadsheet. When performing the QC step, a senior geonames employee at GSI

reviews each of thousands of pieces of data entered during the RL step, checking for the types of errors that are most likely to occur, based on his training and experience. Finally, the QA step includes running two GSI-developed error-finding software tools that reduce errors and increase productivity and efficiency. GSI refers to these two software tools as the "QC tool" and the "edge-matching tool." The QC tool scans the data to identify possible errors, and is based upon a set of "rules," that GSI developed through its years of geonames work.

GSI works on several maps simultaneously in its geonames work, with each map representing a portion of the total region or country at issue. Certain map features, such as rivers, for example, often cross several maps. Accordingly, the edge-matching tool enables GSI to scan the data across all of the maps for a given country or region, identify possible errors related to the features near the edges of the maps, and correct any errors.

GSI claims that its QC and edge-matching tools enable GSI to produce highly accurate data much more efficiently than is possible without such tools. GSI considers its entire GNP a proprietary, confidential trade secret, and has undertaken efforts to maintain its secrecy.

In 2006, GSI hired Collelo, who had never done geonames work before, and trained Collelo to do geonames work, exposing him to its confidential information and alleged trade secrets.

3

Specifically, Collelo worked with GSI's GNP, including GSI's QC and edge-matching tools. Upon his employment with GSI, Collelo and GSI executed an employment contract which contained three documents (together, the "contract"): (1) an "Employment Agreement;" (2) a document entitled "Addendum A;" and (3) an "Employee Confidential Information, Non-Competition, Non-Disparagement, and Non-Solicitation Agreement" ("Addendum B"). The Employment Agreement specifically incorporated Addendum B by reference and further stated that "[t]his Agreement and any Addenda hereto, constitute the entire agreement between [Collelo and GSI]."

Significantly, for the purposes of this case, Addendum B included a "non-disclosure provision," prohibiting Collelo from disclosing GSI's confidential information "to any person or entity without first obtaining [GSI's] written consent," and a "non-solicitation provision" prohibiting Collelo from soliciting, performing, or attempting to perform any "Conflicting Services for a Customer or . . . contractor of [GSI's]" for a period of one year after Collelo's employment with GSI ended.

In early 2008, Collelo resigned from GSI and was hired by Boeing to work in a non-geonames capacity. During his exit interview, GSI reminded Collelo of his continuing obligations under the contract and Addendum B, in particular.

GSI subsequently learned, in June 2008, that Collelo was

4

performing geonames work at Boeing when Collelo came to GSI's office as part of a Boeing team to work on a future Boeing-GSI geonames project. GSI advised Boeing that Collelo was in violation of Addendum B's non-solicitation provision. Specifically, GSI believed that Collelo was in breach of the non-solicitation provision because he was performing geonames work for GSI's customer, Boeing, and because Boeing had pressured GSI to reduce its rates and hours on a bid for geonames work under a subcontract with Boeing. The parties attempted to resolve the matter, but were unable to agree on a resolution.

Thereafter, GSI learned that Collelo had performed geonames work at Boeing and that he had created a QC tool for Boeing to use in its geonames work. Just four months after Collelo began working at Boeing, Collelo wrote a memo to his superiors claiming that he had developed a QC tool and an edge-matching tool, and that he had "dramatically increased production" and efficiency in geonames work at Boeing, such that Boeing was now "three weeks ahead of schedule," even though Boeing had had a significant backlog of geonames work prior to Collelo's arrival.

GSI filed suit against Boeing, Autometric, Inc. ("Autometric"), a wholly-owned subsidiary of Boeing, and Collelo, alleging that: (1) Collelo breached his contract with GSI by performing conflicting services for Boeing and by

5

disclosing "GSI's confidential information" to Boeing; (2) GSI is entitled to recover its reasonable attorneys' fees and costs, pursuant to section 5.8 of the Employment Agreement, if it prevailed in its complaint for breach of contract; (3) Collelo violated the Trade Secrets Act; (4) Boeing and/or Autometric violated the Trade Secrets Act; and (5) Boeing and/or Autometric tortiously interfered with GSI's contract with Collelo. GSI sought: (1) damages in an amount to be determined at trial, but not less than $10 million; (2) reasonable royalties from the defendants' improper and unauthorized use of GSI's trade secrets; (3) an injunction against use or disclosure of GSI's trade secrets; (4) an injunction requiring Collelo to abide by the terms of the Employment Agreement; (5) attorneys' fees and costs; and (6) punitive damages of $350,000.

Two expert witnesses testified at trial for GSI regarding damages. Specifically, the expert witnesses testified regarding: (1) the amount that GSI's value had decreased due to Collelo's and Boeing's actions; (2) GSI's cost to develop its trade secrets and confidential information; (3) Boeing's unjust enrichment as a result of its acquisition and use of GSI's trade secrets and confidential information; and (4) reasonable royalties for Collelo's disclosure and Boeing's use of GSI's trade secrets.

At the conclusion of GSI's case in chief, the defendants filed a motion to strike, arguing that, among other things: (1)

6

GSI offered no evidence that Boeing "directly competes" with GSI for geonames work and, as a result, Collelo cannot be found in breach of the non-solicitation provision in the contract; (2) GSI is not entitled to any damages for its breach of contract claim because GSI has not presented any evidence or expert opinion on damages for that claim; (3) GSI cannot recover as damages both the alleged cost of developing its trade secret and the lost value to the company as a result of misappropriation because awarding both measures of damages would amount to a double recovery; (4) GSI cannot recover damages based on the loss of the trade secret because GSI admits the value of its trade secret has not been destroyed and has not been publicly disclosed outside Boeing; and (5) GSI cannot obtain punitive damages because there are no allegations sufficient to show willful or malicious conduct by defendants.

The trial court did not permit the jury to consider the existence of trade secrets or misappropriation. Instead, the trial court granted the defendants' motion to strike at the close of GSI's evidence and dismissed GSI's entire case with prejudice, reasoning that, "even if Mr. Collelo had taken something, and [despite the fact that Boeing] was a customer of GSI, Boeing is not doing and has not been doing the same work as GSI." While the trial court did conclude that "[t]here has been no loss of business to GSI," and "[t]here has been no [showing] that Boeing has made more money because it has used

7

these trade secrets," it did so based on its conclusion that "[t]here is no way that the jury could find that Boeing has taken GSI's secret in order to do the work that that secret was designed for."

Following the trial court's dismissal of GSI's suit, Collelo filed a motion for attorneys' fees, alleging that he was entitled to attorneys' fees and costs pursuant to section 5.8 of the Employment Agreement. Section 5.8 of the Employment Agreement stated that, "[i]n the event of a dispute arising out of the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs." Collelo also argued that GSI was estopped from taking inconsistent positions as to which attorneys' fees provision governs within this action because it had cited, at all times relevant, section 5.8 of the Employment Agreement as the provision governing attorneys' fees.

The trial court ultimately ruled that GSI was not estopped from arguing that section 10.2 of Addendum B applied because GSI's earlier position that it was entitled to attorneys' fees pursuant to section 5.8 of the Employment Agreement "was a legal position . . . but it was not a factual position which it now seeks to back away from." The trial court also found that "only [A]ddendum B is at issue in this case," and that the subject matter contained in Addendum B was "the subject of this

8

lawsuit and the trial that was had in this matter." Consequently, the trial court found, as a matter of law, that the section 10.2 attorneys' fees provision in Addendum B governed any attorneys' fees dispute in this case.

GSI and Collelo timely filed their notices of appeal and we granted these appeals on the following assignments of error:

For Geographic Services, Inc. v. Collelo, et al., Record No. 101421:

1. The Circuit Court erred by requiring evidence of competition between GSI and Boeing to establish liability or a right to a remedy under the [Trade Secrets Act].

2. The Circuit Court improperly weighed evidence and credibility, disregarded GSI's evidence or otherwise failed to consider the evidence in the light most favorable to GSI when ruling on Respondent's Motion to Strike that GSI purportedly failed to present evidence of competition between GSI and Boeing.

3. The Circuit Court erred by dismissing all of GSI's claims against all Respondents because only the part of the breach of contract claim against Collelo based on the non-solicitation provision of his Employment Agreement even arguably required a showing of competition between GSI and Boeing, and Respondents had only sought dismissal of that part of the breach of contract claim against Collelo and exclusion of certain other evidence.

For Collelo v. Geographic Services, Inc., Record No. 101411:

1. The trial court erred in concluding that, because GSI was reversing position on a question of law, not a question of fact, GSI was not estopped from reversing its position with respect to the applicability of a two-way fee-shifting provision. That holding violates this Court's long-standing

9

doctrine of estoppel by inconsistent legal
positions.

2.   The trial court erred in denying attorneys' fees
to Collelo because it (i) construed an addendum to
an employment agreement as a separate contract, in
violation of this Court's precedent and the plain
language of the agreement itself; and (ii) failed
to give full effect to all clauses of the
contract, even where there was no conflict between
provisions, in violation of this Court's
precedent.

II.  Analysis

A. <u>Geographic Services, Inc. v. Collelo, et al.</u>,
Record No. 101421

1. Standard of Review

We have clearly articulated the standard of review for

cases of statutory interpretation:

[A]n issue of statutory interpretation is a pure
question of law which we review de novo.  When the
language of a statute is unambiguous, we are bound by
the plain meaning of that language. Furthermore, we
must give effect to the legislature's intention as
expressed by the language used unless a literal
interpretation of the language would result in a
manifest absurdity.  If a statute is subject to more
than one interpretation, we must apply the
interpretation that will carry out the legislative
intent behind the statute.

<u>Conyers v. Martial Arts World of Richmond, Inc.</u>, 273 Va. 96,

104, 639 S.E.2d 174, 178 (2007) (citations omitted).

Additionally, we have stated that,

[g]ranting a motion to strike at the end of
plaintiff's case, if done erroneously, can lead to
a substantial waste of judicial resources – a
consequence to be avoided.  This is particularly
true in a situation where the motion to strike was
granted on a ground raised by the court <u>sua
sponte</u>.

10

To guard against the waste that can be occasioned by granting a motion to strike at the end of plaintiff's evidence, this Court has developed rules that govern the way in which a trial court must view plaintiff's evidence when considering such a motion.

DHA, Inc. v. Leydig, 231 Va. 138, 139-40, 340 S.E.2d 831, 832 (1986) (citation omitted).  Specifically,

[w]hen the sufficiency of a plaintiff's evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in plaintiff's favor and should grant the motion only when it is conclusively apparent that plaintiff has proven no cause of action against defendant, or when it plainly appears that the trial court would be compelled to set aside any verdict found for the plaintiff as being without evidence to support it.

Banks v. Mario Indus. of Virginia, Inc., 274 Va. 438, 454-55, 650 S.E.2d 687, 696 (2007) (quoting Saks Fifth Ave., Inc. v. James, Ltd., 272 Va. 177, 188, 630 S.E.2d 304, 311 (2006)).  "According to well-settled principles of appellate review, when the trial court grants a motion to strike the plaintiff's evidence, we review the evidence on appeal in the light most favorable to the plaintiff."  Green v. Ingram, 269 Va. 281, 284, 608 S.E.2d 917, 919 (2005) (citing Perdieu v. Blackstone Family Practice Ctr., Inc., 264 Va. 408, 411, 568 S.E.2d 703, 704 (2002) and Bryan v. Burt, 254 Va. 28, 30-31, 486 S.E.2d 536, 537 (1997)).

Lastly, it should be noted that while GSI complains that the trial court improperly dismissed all of GSI's claims even

11

though the defendants did not request the relief granted by the trial court, a trial court may properly grant a motion to strike on a ground raised by the trial court sua sponte. See DHA, 231 Va. at 139, 340 S.E.2d at 832 (acknowledging that a trial court may grant a motion to strike "on a ground raised by the court sua sponte").

2. GSI's Claims Under the Trade Secrets Act

We have previously recognized that the plain language of the Trade Secrets Act "reflects the General Assembly's decision to protect the owner of a trade secret from another's misuse of that secret. Because the General Assembly has enacted legislation addressing this subject, the role of the courts is limited to construing and applying the terms set forth in the [Trade Secrets] Act." MicroStrategy Inc. v. Li, 268 Va. 249, 263, 601 S.E.2d 580, 588 (2004). Additionally, we have held that, "[i]n order for a plaintiff to establish that [its alleged trade secret] has been the subject of a trade secret violation, two statutory elements must be proved, namely, the existence of a 'trade secret' and its 'misappropriation' by the defendant." Id. at 263, 601 S.E.2d at 588 (citing Code § 59.1-336).

The Trade Secrets Act defines "trade secret" as:

information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:

1. Derives independent economic value, actual or

12

potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Code § 59.1-336.

The trial court, when addressing the defendants' motion to strike with regard to GSI's breach of contract claim, found that,

> [t]here has been no evidence offered that there has been any loss of business by GSI because of competitive conduct on the part of [Boeing]. There has been no evidence that Boeing has benefitted [sic] from using this tool in a manner that would affect the business of GSI, namely, the substantive business of its Geonames work.

Similarly, the trial court ruled, when addressing GSI's claim under the Trade Secrets Act, that:

> the reason [for the Trade Secrets Act is] that if you have a secret you have developed for a particular work and it is taken by someone else, then [they] will be in violation of the terms of the [Trade Secrets A]ct, and . . . the holder of the trade secret[] will be entitled to damages.
>
> And the damages are now codified. They are set out in the [Trade Secrets A]ct. And what are they? The loss to the business of the person who has had its trade secret taken, the unjust enrichment to the entity that has been able to do the business of the person holding the trade secret or some portion of that, and the reasonable royalties, if there is nothing else, for the use of that particular . . . trade secret.
>
> But, again, <u>the reason for the rule is to</u> <u>avoid</u> <u>a person benefiting by doing the type of</u> <u>work which</u> <u>this trade secret enables to the</u> <u>detriment of the</u> <u>creator of the trade secret</u>. And, once again, Boeing

13

is not doing that work. There simply has been no evidence whatsoever, not merely that <u>Boeing is not competing with GSI</u>, but in response to the trade secret aspect, <u>that</u> <u>Boeing is even doing the same work as GSI</u>.

. . . .

And, so, it would be far easier for the Court to send this matter to the jury but what damages will a jury have to consider? . . . There has been no loss of business to GSI. There has been no [showing] that Boeing has made more money <u>because it has used these trade secrets to</u> do the same kind of work . . . . There is no way that the jury could find that Boeing has taken GSI's secret <u>in order to do the work that that</u> <u>secret was designed for</u>. Boeing is simply not doing that kind of work.

<u>For these reasons</u>, the motion of the defendants to strike the plaintiff's evidence is granted.

(Emphasis added.)

Therefore, it is clear that, contrary to the defendants' claim, the trial court did not rule that "GSI had utterly failed to present any evidence of harm or injury caused by the [d]efendants." Rather, the trial court found that "the reason for the [Trade Secrets Act] is to avoid a person benefiting by doing the type of work which this trade secret enables to the detriment of the creator of the trade secret," and that there had been "no evidence whatsoever," that Boeing is "competing with GSI," or "that Boeing is even doing the same work as GSI." While the trial court did conclude that "[t]here has been no loss of business to GSI," and "[t]here has been no [showing] that Boeing has made more money because it has used

14

these trade secrets," it did so based on its conclusion that "[t]here is no way that the jury could find that Boeing has taken GSI's secret <u>in order to do the work that that secret was designed for</u>."  (Emphasis added.)  We disagree with the underlying premise of the trial court's ruling.

Significantly, for the purposes of this case, the Trade Secrets Act defines "misappropriation" by providing two alternative definitions.  Code § 59.1-336.  The Trade Secrets Act first defines "misappropriation" as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Code § 59.1-336. The Trade Secrets Act also defines "misappropriation" as:

> 2. Disclosure or use of a trade secret of another without express or implied consent by a person who
>
> a. Used improper means to acquire   knowledge of the trade secret; or
>
> b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
>
>> (1) Derived from or through a person who had utilized improper means to acquire it;
>>
>> (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;
>>
>> (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>>
>> (4) Acquired by accident or mistake.

15

Code § 59.1-336.

Accordingly, the Trade Secrets Act does not require that one who is accused of misappropriating a trade secret use the allegedly misappropriated trade secret to compete with the holder of the trade secret.  Id.

Once a complainant has established the misappropriation of a trade secret, the Trade Secrets Act provides that the "complainant is entitled to recover damages for misappropriation," including "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  Code § 59.1-338.  The Trade Secrets Act also states that, "[i]f a complainant is unable to prove a greater amount of damages by other methods of measurement, the damages caused by misappropriation can be measured exclusively by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."  Code § 59.1-338.

The defendants argue on appeal that GSI did not prove its damages; consequently, the trial court properly granted the motion to strike.  This contention ignores the actual ruling made by the trial court.  The trial court's ruling was based upon the faulty premise that competition must be shown in order to have a cause of action based upon the Trade Secrets Act and that damages must flow from the proof of competition.  As a

16

result, the trial court's analysis of the proper showing of damages was based upon losses as a result of competition. Illustrative of this premise are the trial court's explanatory remarks when granting the motion to strike:

Boeing is not doing and has not been doing the same work as GSI.

. . . .

There has been no evidence offered that there has been any loss of business by GSI because of competitive conduct on the part of The Boeing Corporation.

. . . .

[T]he reason for the rule is to avoid a person benefiting by doing the type of work which this trade secret enables to the detriment of the creator of the trade secret. And, once again, Boeing is not doing that work. There simply has been no evidence whatsoever . . . that Boeing is even doing the same work as GSI.

. . . .

And, so, it would be far easier for the Court to send this matter to the jury but what damages will a jury have to consider? What damages? There has been no loss of business to GSI. There has been no profitability shown on the part of Boeing that Boeing has made more money because it has used these trade secrets to do the same kind of work or similar work.

. . . There is no way that the jury could find that Boeing has taken GSI's secret in order to do the work that that secret was designed for. Boeing is simply not doing that kind of work.

For these reasons, the motion of the defendants to strike the plaintiff's evidence is granted.

Whether GSI presented sufficient evidence of damages under

17

a proper analysis of the Trade Secrets Act was not the subject of the trial court's granting of the motion to strike. The trial court's ruling was based upon a faulty premise and the trial court erred in granting the motion to strike. Nonetheless, upon consideration of the evidence in the light most favorable to GSI, we cannot say as a matter of law that GSI did not present sufficient evidence on the question of damages to survive a motion to strike.

### 3. GSI's Breach of Contract and Tortious Interference with a Contract Claims

We have previously stated that,

> [a]s a general rule, damages for breach of contracts are limited to the pecuniary loss sustained. Proof of damages is an essential element of a breach of contract claim, and failure to prove that element warrants dismissal of the claim. The plaintiff also has the burden of proving <u>with reasonable certainty the amount of damages</u> and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery.

Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 156, 671 S.E.2d 132, 136 (2009) (citations and internal quotation marks omitted) (emphasis added). We have also recognized that

> the tort of intentional interference with performance of a contract by a third party is a permissible cause of action in Virginia. The elements required for a prima facie showing of the tort are: (i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferor; (iii) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (iv) resultant damage to the party whose

18

relationship or expectancy has been disrupted. _Lewis-Gale Med. Ctr., LLC v. Alldredge_, 282 Va. 141, 149, 710 S.E.2d 716, 720 (2011) (quoting _DurretteBradshaw, P.C. v. MRC Consulting, L.C._, 277 Va. 140, 145, 670 S.E.2d 704, 706 (2009) (citing _Chaves v. Johnson_, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985))) (internal quotation marks omitted).

The contract in this case included a non-disclosure provision, which provided that Collelo would "not disclose [GSI's] Confidential Information to any person or entity without first obtaining [GSI's] written consent."  The contract also included a non-solicitation provision, which stated that Collelo agreed that

> for the one (1) year period after the date [his] employment [with GSI] ends for any reason [he would] not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others . . . solicit, perform, or attempt to perform any Conflicting Services for a Customer . . . or contractor of [GSI's] with whom I had . . . contact or whose identity I learned as a result of my employment with [GSI].

GSI alleged in its complaint both that "Collelo's performance of Conflicting Services for Autometric and/or Boeing is a breach of the [contract]," and "Collelo's disclosure of GSI's confidential information to Autometric and/or Boeing is [a] breach of the [contract]."  GSI also alleged in its complaint that "Autometric and/or Boeing intentionally interfered with, induced, or caused Collelo to

19

breach his obligations to GSI."

At trial, GSI offered the testimony of two expert witnesses regarding damages incurred as a result of the defendants' actions in this case.  In addition to testifying for GSI as an expert on the quantification of damages concerning unjust enrichment and reasonable royalties, Michele Riley ("Riley") testified as an expert on the quantification of damages stemming from the disclosure of confidential information. Significantly, however, Riley stated at trial that she would not testify regarding any damages related to GSI's tortious interference with a contract claim.  Upon cross-examination, the following exchange occurred:

> [Defendants' Counsel:] I want to talk first about what you are offering an opinion on and what you are not.  You understand that there are . . . multiple claims in this case; correct?
>
> [Riley:] I do.
>
> [Defendants' Counsel:] And one of those claims is what's been called tortious interference with [a] contract or the interference with a contract at issue. You understand that's a claim; right?
>
> [Riley:] I do.
>
> [Defendants' Counsel:] That, ma'am, is not something you are offering an opinion on; correct?
>
> [Riley:] My opinions relate to trade secret misappropriation and misuse of confidential information.

In addition to her testimony regarding unjust enrichment

and reasonable royalties, Riley also testified regarding GSI's cost to develop its trade secrets and stated that she agreed with GSI's determination that the cost to develop its trade secrets was about $3.3 million – the value of which represented an "actual loss to GSI" because "the value [of GSI's trade secret has] decreased because of Boeing's use of the trade secret." Significantly, however, while Riley testified regarding GSI's cost to develop its trade secrets, Riley did not testify as to the actual value of GSI's trade secrets or the actual diminution in value of either GSI's trade secrets or GSI, itself, as a result of the defendants' actions. Riley's testimony, as a whole, only supported GSI's claims under the Trade Secrets Act.

Additionally, Kace G. Clawson ("Clawson") testified for GSI as an expert in the field of business valuation. Clawson stated, however, that he would testify solely regarding trade secret misappropriation. Upon voir dire examination for qualification as an expert, the following exchange occurred:

> [Defendants' Counsel:] Sir, I'm correct that you are not providing an opinion or calculation for the contract claim in this case; correct?
>
> [Clawson:] That's correct.
>
> [Defendants' Counsel:] And you are [also not] providing an opinion with respect to tortious interference, are you?
>
> [Clawson:] That's correct.

21

[Defendants' Counsel:] Sir, you believe you are providing an opinion solely on the issue of trade secret misappropriation damages; correct, sir?

[Clawson:] That's correct.

Accordingly, Clawson's testimony was only offered in support of GSI's claims under the Trade Secrets Act and, in fact, he only testified regarding two valuations he conducted concerning GSI.

First, Clawson valued GSI, with its trade secrets and confidential information intact, at just over $34.1 million. Second, Clawson valued GSI, when considering the risk of loss to its projected cash flow as a result of its trade secrets and confidential information not being intact, at about $29.7 million – resulting in a loss to GSI's overall value of around 44.3 million.

GSI offered the testimony of two expert witnesses regarding damages incurred by GSI as a result of the defendants' actions but, significantly, Clawson's testimony was offered only for GSI's claims under the Trade Secrets Act, and Riley's testimony was competent only to establish GSI's claims under the Trade Secrets Act.

Accordingly, after viewing the evidence on appeal in the light most favorable to GSI, we hold that the evidence was insufficient to: (1) prove, with any reasonable certainty, the amount of damages incurred as a result of Collelo's alleged

22

breach of contract; and (2) prove that GSI incurred damages as a result of Autometric's and/or Boeing's tortious interference with a contract. As a result, we hold that the trial court did not err in striking GSI's breach of contract and tortious interference with a contract claims.

### 4. GSI's Claim for Attorneys' Fees in Connection with Its Breach of Contract Claim

In its complaint, GSI claimed that it was entitled to recover its attorneys' fees and costs in connection with its breach of contract claim, pursuant to section 5.8 of the Employment Agreement. However, because GSI cannot prevail on its breach of contract claim, we hold that the trial court did not err in dismissing GSI's claim for attorneys' fees in connection with its breach of contract claim.

### 5. Collelo's Claim for Attorneys' Fees in Connection with the Breach of Contract Claim

Following the trial court's dismissal of GSI's suit, Collelo filed a motion for attorneys' fees, alleging that he was entitled to attorneys' fees and costs pursuant to section 5.8 of the Employment Agreement. The trial court ultimately ruled that "only [A]ddendum B is at issue in this case," and the subject matter contained in Addendum B was "the subject of this lawsuit and the trial that was had in this matter." Consequently, the trial court denied Collelo's motion for attorneys' fees, finding, as a matter of law, that only the section 10.2 attorneys' fees provision in Addendum B governed

23

and, under that provision, only GSI could be awarded attorneys' fees.

The contract in this case was made up of three documents:  (1) the "Employment Agreement;" (2) "Addendum A;" and (3) "Addendum B," which included the non-solicitation and non- disclosure provisions.  Significantly, the contract included two different attorneys' fees provisions; one in the Employment Agreement and one in Addendum B.  By the plain language of the contract, each attorneys' fee provision only applies to the contract document in which it is found.

Specifically, the Employment Agreement stated: "THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into . . . between [GSI and Collelo]."  (Emphasis added.) Section 5.8 of the Employment Agreement stated that, "[i]n the event of a dispute arising out of the interpretation or enforcement of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs." (Emphasis added.)

Additionally, Addendum B stated that:

I [(Collelo)] hereby enter into this Employee
Confidential Information, Non-Competition, Non-
Disparagement and Non-Solicitation Agreement
(the "Agreement") and agree as follows:

. . . .

10.2  I agree that if [GSI] is successful
in whole or in part in any legal or equitable
action against me under this Agreement, the
Company shall be entitled to payment of all

24

> costs, including reasonable attorney's fees,
> from me.

(Emphasis added and in original.)

The trial court denied Collelo's motion for attorneys' fees and costs, explaining that,

> these parties had contract documents that contained two different fee-shifting provisions for two different documents which were part of the contract documents, namely, the [E]mployment [Agreement] and [Addendum B]. This suit was only as to the nonsolicitation or noncompetition contract [(Addendum B)].
>
> That being the case, the fee provision which is at issue and which would allow for the recovery of fees allows for the recovery of fees only as to GSI if it prevails. It did not prevail.

The trial court did not err in ruling that the attorneys' fees provision in the Employment Agreement applies to disputes arising out of that document and the attorneys' fees provision in Addendum B applies to disputes arising out of the subject matter of that document. Further, the trial court did not err in holding that Collelo could not recover attorneys' fees under Addendum B.

An examination of GSI's complaint demonstrates that GSI's breach of contract claim ("Breach of Contract – Collelo") was based entirely upon the subject matter of Addendum B. Specifically, GSI alleged that: (1) "Collelo was obligated not to perform Conflicting Services for any of GSI's current or potential customers"; (2) Collelo's "performance of Conflicting Services for GSI's customer, Autometric and/or

25

Boeing [was] a breach of the Employment Agreement"; (3) "Collelo was obligated to maintain the secrecy of all of GSI's confidential information"; and (4) "Collelo's disclosure of GSI's confidential information to Autometric and/or Boeing [was] a breach of the Employment Agreement." Significantly, Addendum B's non-solicitation provision prohibited Collelo from soliciting, performing, or attempting to perform any "Conflicting Services for a Customer or . . . of [GSI's]" for a period of one year after Collelo's employment with GSI ended. Similarly, Addendum B's non-disclosure provision provided that Collelo would "not disclose [GSI's] Confidential Information to any person or entity without first obtaining [GSI's] written consent." Accordingly, a careful review of the pleadings and the arguments made at trial and on appeal reveals that the trial court did not err when it concluded that the subject of the breach of contract claim involved matters arising out of Addendum B.

Finally, we address Collelo's arguments that the trial court erred by permitting GSI to argue that Addendum B attorneys' fee provisions applied when it had previously pled that section 5.8 of the Employment Agreement applied. First, Collelo argues that judicial estoppel prohibits this change of position. We disagree. As we have previously observed, "[t]he doctrine of judicial estoppel applies where the position taken is inconsistent relative 'to the same fact or state of facts.' "

26

*Lofton Ridge, LLC v. Norfolk Southern Ry. Co.*, 268 Va. 377, 382, 601 S.E.2d 648, 651 (2004) (quoting *Burch v. Grace St. Bldg. Corp.*, 168 Va. 329, 340, 191 S.E. 672, 677 (1937)).

Next, Collelo argues that the trial court erred in permitting GSI to take a legal position inconsistent with its pleadings in violation of the prohibition against approbation and reprobation. "The prohibition against approbation and reprobation forces a litigant to elect a particular position, and confines a litigant to the position that she first adopted." *Matthews v. Matthews*, 277 Va. 522, 528, 675 S.E.2d 157, 160 (2009). The principle stated by Collelo is certainly correct; however, it does not apply in this case. GSI's pleadings did assert that section 5.8 of the Employment Agreement provided for an award of attorneys' fees in the event that it prevailed on the breach of contract claim. This position is not inconsistent with its later position that Collelo was not entitled to attorneys' fees under Addendum B. The trial court did not err in denying Collelo's motion for attorneys' fees in relation to GSI's breach of contract claim.

III.

Conclusion

We hold that the trial court erred when it dismissed GSI's claims under the Trade Secrets Act. We also hold that

27

the trial court did not err when it dismissed GSI's: (1) breach of contract claim; (2) tortious interference with a contract claim; and (3) claim for attorneys' fees in connection with its breach of contract claim. Finally, we hold that the trial court did not err when it denied Collelo's motion for attorneys' fees in relation to GSI's breach of contract claim.

Accordingly, we will affirm in part and reverse in part the judgment of the trial court and remand this case for a new trial on GSI's claims under the Trade Secrets Act.

Record No. 101411 – <u>Affirmed</u>.
Record No. 101421 – <u>Affirmed in part, reversed in part, and remanded</u>.

JUSTICE McCLANAHAN, concurring in part, and dissenting in part.

While I agree with the majority's holdings in this case in all other respects, I disagree with the majority holding in part II.A.2. The majority reverses the trial court's dismissal of Geographic Services Inc.'s (GSI) claims under the Virginia Uniform Trade Secrets Act (Trade Secrets Act), Code §§ 59.1-336 through -343. The trial court, in my opinion, reached the correct result regarding GSI's Trade Secrets Act claims when it granted the motion filed by the Boeing Company, Autometric, Inc. and Anthony Collelo (collectively, the defendants) to strike GSI's evidence offered in support of

28

those claims.  I reach that conclusion because I believe GSI failed, as a matter of law, to present evidence sufficient to submit those claims for damages to the jury under any of GSI's theories for recovery under the Trade Secrets Act.

I.

The Trade Secrets Act provides that the complainant, upon establishing the misappropriation of a trade secret, is "entitled to recover damages" to the extent the complainant can also prove "the actual loss caused by misappropriation," or "the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."  Code § 59.1-338(A) (emphasis added).  Additionally, as a third alternative, "[i]f a complainant is unable to prove a greater amount of damages by other methods of measurement, the damages caused by misappropriation can be measured exclusively by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."  Id.  (emphasis added).

To establish a prima facie case under this statutory scheme during its case-in-chief, GSI had the burden to show " 'with reasonable certainty the amount of [its] damages and the cause from which they resulted [i.e., misappropriation of its trade secret]; speculation and conjecture cannot form the basis of the recovery.' "  Banks v. Mario Indus. of Va., Inc., 274 Va. 438, 455, 650 S.E.2d 687, 696 (2007) (quoting

29

Saks Fifth Ave., Inc. v. James, Ltd., 272 Va. 177, 188, 630 S.E.2d 304, 311 (2006)); See Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009) ("The plaintiff bears the burden to establish the element of damages with reasonable certainty." (citation omitted)). In order to make that showing, GSI was thus required to demonstrate " 'a causal connection between the defendant[s'] wrongful conduct and the damages asserted.' " Banks, 274 Va. at 455, 650 S.E.2d at 696 (quoting Saks Fifth Ave., Inc., 272 Va. at 189, 630 S.E.2d at 311). Furthermore, GSI had to establish " 'the amount of those [alleged] damages by using a proper method and factual foundation for calculating damages.' " Id.

The defendants "test[ed]" the legal sufficiency of GSI's evidence of damages under the Trade Secrets Act by filing their motion to strike GSI's evidence, Supervalu, Inc. v. Johnson, 276 Va. 356, 369, 666 S.E.2d 335, 342 (2008); Little v. Cooke, 274 Va. 697, 718, 652 S.E.2d 129, 141 (2007); and the sufficiency of that evidence is squarely before us on appeal, which, as an issue of law, we review de novo. Syed v. ZH Techs., Inc., 280 Va. 58, 68, 694 S.E.2d 625, 631 (2010); Banks, 274 Va. at 451, 650 S.E.2d at 694. See Costner v. Lackey, 223 Va. 377, 382, 290 S.E.2d 818, 820 (1982) ("In considering the motion to strike the plaintiffs' evidence, the trial court was not sitting as the fact finder

30

but was ruling on a matter of law to determine whether the [plaintiffs] had made out a prima facie case.").

Just as with GSI's other claims in this case, the circuit court's granting of the defendants' motion to strike should be affirmed as to GSI's Trade Secrets Act claims if " 'it is conclusively apparent that [GSI] has proven no cause of action against [the] defendant[s] [under the Trade Secrets Act], or [if] it plainly appears that the trial court would [have been] compelled to set aside any verdict found for [GSI] [under the Trade Secrets Act] as being without evidence to support it.' " Banks, 274 Va. at 455, 650 S.E.2d at 696 (quoting Saks Fifth Ave., Inc., 272 Va. at 188, 630 S.E.2d at 311). The majority summarily concludes that GSI presented sufficient evidence on the elements of damages under the Trade Secrets Act. I disagree.

                              II.

At trial, GSI offered the testimony of two expert witnesses regarding its alleged damages recoverable against the defendants under the Trade Secrets Act as a result of their actions in this case. Michele Riley (Riley) testified for GSI as an expert on the quantification of damages concerning unjust enrichment, reasonable royalties and disclosure of confidential information - all in the context of trade secrets misappropriation. Kace Clawson (Clawson) testified for GSI as an expert in the field of business

valuation.

## A. Actual Loss

Regarding actual loss, GSI presented (i) Clawson's testimony as to two valuations he conducted concerning GSI; and (ii) Riley's testimony regarding GSI's cost to develop its alleged trade secret in relation to its geonames procedure.

(i) <u>Clawson</u>.  According to Clawson, he valued GSI, with its trade secret and confidential information intact, at just over $34.1 million.  Clawson then valued GSI by purportedly taking into consideration the risk of loss to GSI's projected cash flow as a result of the disclosure of its trade secret and confidential information.  This variable, Clawson stated, reduced GSI's value to about $29.7 million – resulting in a loss to GSI's overall value of around $4.4 million.

This evidence was insufficient, however, to submit the question of "actual loss" to the jury.  Clawson admitted that his testimony regarding his two valuations of GSI had nothing to do with GSI's actual loss.  Upon voir dire examination for qualification as an expert, the following exchange occurred:

> [Defendants' counsel:] Sir, if I wanted to know or the [c]ourt wanted to know or the jury wanted to know how much money was actually lost by GSI, out-of-pocket loss, your opinion does not deal with that issue; true?  [Clawson:] That's correct.
>
> [Defendants' counsel:] You are not offering an

opinion that GSI lost one, three, five, or any amount of millions of dollars because of the allegations of the misappropriation here in terms of actual dollars; correct?

[Clawson:] That's correct.

Clawson also admitted that his valuations purportedly measured GSI's total worth on only one particular date, February 28, 2008, before Collelo joined Boeing in March 2008; and that he did not "take into account any real world events," and did not consider whether GSI lost or gained any customers or contracts following Collelo's employment at Boeing.

(ii) Riley. Riley testified that she agreed with GSI's determination that the cost to develop its trade secret was about $3.3 million. Riley indicated that this sum represented an "actual loss to GSI" in that "the value [of GSI's trade secret had] decreased because of Boeing's use of the trade secret." Yet, Riley did not testify as to the actual value of GSI's trade secret or the actual diminution in value of either GSI's trade secret or GSI, itself, as a result of the defendants' actions. Moreover, Riley admitted that there was no evidence of Boeing taking any contracts away from GSI.

The insufficiency of the testimony of both Clawson and Riley as evidence of actual loss to GSI allegedly caused by the defendants is reinforced by the testimony of GSI's operations manager, Jennifer Lopatin. Lopatin admitted that

33

GSI could not "point to any money, whether it's a million or half a million, that was actually lost in terms of a contract or any actual money."  In short, she stated, GSI "ha[d not] actually lost [any] money."

In the context of a trade secret case, I find no legal authority, nor has GSI cited any, supporting an award of either (a) the alleged diminished value of a business or (b) the development costs of a trade secret, as damages for "actual loss" to the plaintiff, where the plaintiff, as here, remains a viable business, continues to fully utilize the trade secret process, and has not, in fact, shown any lost profits as a result of the misappropriation.

As a result, I would hold that GSI did not use " 'a proper method and factual foundation for calculating' " actual loss damages; and that it thus failed to prove " 'with reasonable certainty' " any actual losses it may have sustained.  Banks, 274 Va. at 455, 650 S.E.2d at 696 (quoting Saks Fifth Ave., Inc., 272 Va. at 189, 630 S.E.2d at 311).  Consequently, in my view, GSI's proof of damages on this issue was insufficient to submit to the jury.

### B. Unjust Enrichment

To recover on its claim for unjust enrichment under the Trade Secrets Act, GSI had to prove (1) it conferred a benefit on Boeing, albeit involuntarily; (2) Boing knew of the benefit and should reasonably have expected to repay

34

GSI; and (3) Boing accepted or retained the benefit without paying for its value. See Schmidt v. Household Finance Corp., 276 Va. 108, 116, 661 S.E.2d 834 (2008) (setting forth elements of unjust enrichment claim).

In quantifying GSI's unjust enrichment claim, Riley testified that she multiplied the total amount of revenue billed by Boeing for geonames work following Collelo's arrival (approximately $5.8 million) by the profit margin earned by Boeing on its geonames work as testified to by Boeing's corporate designee (12 percent). Accordingly, Riley concluded that Boeing received almost $700,000 in unjust enrichment.

Riley admitted, however, to attributing Boeing's total geonames revenue following Collelo's arrival at Boeing to the acquisition of GSI's trade secret, despite the fact that two-thirds of the contracts Riley relied upon in her calculation were in place before Collelo worked at Boeing. In so doing, Riley did not attempt to distinguish between Boeing's just enrichment, in the form of geonames profits earned on contracts which were in place before Boeing hired Collelo, and Boeing's alleged unjust enrichment, in the form of any earnings received due to the misappropriation of GSI's trade secret.

Moreover, Riley admitted that her unjust enrichment calculation did not "try to figure out how much better, faster or stronger things became" at Boeing, or "how much

35

more efficient" Boeing became following Collelo's arrival. Rather than providing a factual basis upon which a jury could discern between Boeing's just and unjust enrichment, Riley testified that "the jury can decide for itself how to work the numbers out."

I therefore would hold that GSI did not use " 'a proper method and factual foundation for calculating' " unjust enrichment damages; and that GSI thus failed to prove " 'with reasonable certainty' " the amount Boeing may have been unjustly enriched due to its misappropriation of GSI's trade secret. Banks, 274 Va. at 455, 650 S.E.2d at 696 (quoting Saks Fifth Ave., Inc., 272 Va. at 189, 630 S.E.2d at 311). Consequently, in my view, GSI's proof of damages on this issue was also insufficient to submit to the jury.

## C. Reasonable Royalty

Finally, regarding a reasonable royalty, Riley testified that she used the "rule of thumb" commonly used in her practice called the "25 percent rule." Application of this rule, Riley stated, would result in GSI receiving 25 percent of the profit attributable to Boeing's use of GSI's trade secret as a reasonable royalty. Riley stated this would amount to almost $175,000. Most significantly, Riley explained that she derived this sum by multiplying Boeing's alleged $700,000 unjust enrichment profit margin following Collelo's arrival by 25 percent.

This means Riley's reasonable royalty calculation was based entirely upon her flawed unjust enrichment calculation discussed above. I therefore would hold that GSI did not use " 'a proper method and factual foundation for calculating' " a reasonable royalty; and that GSI thus failed to prove " 'with reasonable certainty' " the amount of any reasonable royalty it may have been entitled to. Id. Consequently, in my opinion, GSI's proof of damages on this issue was likewise insufficient to submit to the jury.

### III.

After considering the evidence on appeal in the light most favorable to GSI, I would hold that GSI did not present evidence sufficient to submit its claims for damages to a jury under any of GSI's theories of recovery under the Trade Secrets Act. It plainly appears to me that GSI "'has proven no cause of action against [the] defendant[s]'" under the Trade Secrets Act; and that the trial court would have been " 'compelled to set aside any verdict found for [GSI] as being without evidence to support it.' " Id. (quoting Saks Fifth Ave., Inc., 272 Va. at 188, 630 S.E.2d at 311). Thus, despite the trial court's error in concluding that one who is accused of misappropriating a trade secret must use the trade secret to compete with the holder of the trade secret, I would hold that the trial court properly sustained the defendants' motion to strike in relation to GSI's claims under the Trade Secrets Act.

37